191 N.J. Super. 192 (1983)
465 A.2d 948
WILLIAM DERMODY, PLAINTIFF,
v.
ELMER A. STICCO, MICHAEL R. ROSSI, JR., GEORGE L. HERBERT, DATRON SYSTEMS, INC., AND INTERNATIONAL CONTROLS CORP., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Hudson County.
Decided May 5, 1983.
*193 Rabin & Silverman for plaintiff (by I. Stephen Rabin).
Kasen and Kraemer for defendants (by Waldron Kraemer).
*194 CASTANO, J.S.C.
This class action, tried without a jury, arises out of a short form corporate merger in which a defendant corporation, owner of 90% of the stock of a subsidiary, acquired all of the remaining shares of the subsidiary and merged it with another wholly owned subsidiary pursuant to N.J.S.A. 14A:10-5 and N.J.S.A. 14A:10-7(4).
The issue before me is whether the minority shareholders of the subsidiary, whose approval of the merger was not required by the statute, were paid "fair value" for their interest. I find that they were.
At common law the consent of all stockholders was required to carry out corporate mergers and a minority of the shareholders could always block a merger if it was not to their liking or for no reason at all. To protect majorities from arbitrary minorities all states have enacted statutes under which a merger may be ratified by less than a unanimous vote. See Note, 79 Harv.L.Rev. 1453 (1966).
In New Jersey today, mergers proposed by the directors need be approved by only a majority or two-thirds of the shareholders, depending on when the corporation was organized. N.J.S.A. 14A:10-3.
In addition, New Jersey has adopted a short form merger statute, derived from the Delaware Corporation Act. N.J.S.A. 14A:10-5. It provides that a corporation owning at least 90% of the outstanding shares of each class and series of another corporation's stock may merge such other corporation into itself without any shareholder approval at all.
In effect, the parent corporation is authorized to buy out the minority shareholders of the corporation to be merged by converting their shares into cash whether they want to sell or not. N.J.S.A. 14A:10-2(2)(b) and (c). The only limitation is that they must be paid "fair value" for their shares. The statute has never been construed in a reported opinion in this State.
*195 The essential facts in this case were stipulated.
In December of 1979, defendant International Controls Corp. (ICC), a Florida corporation was the owner of more than 90 percent of the outstanding shares of common stock of defendant Datron Systems, Inc. (Datron), a New Jersey corporation, and was the owner of all of its outstanding preferred stock. Datron was a manufacturer and distributor of electro-mechanical and microwave transmission components, electronic relays, power conversion products and steam traps used mainly by the refining industry.
The issued stock of Datron at the time consisted of 5,336,904 shares of common stock, 100,000 cumulative preferred shares and 26,000 cumulative convertible serial preferred shares. On the financial side, Datron was in arrears on its preferred stock dividends in the amount of $9,747,000 and was faced with the obligation of commencing sinking fund payments to redeem the convertible shares within 15 months thereafter.
On December 4, 1979, ICC announced a short form "triangular" merger plan in which it proposed to merge Datron with Nortand Systems, Inc., a wholly-owned subsidiary of ICC. Datron was to be the surviving corporation as a wholly-owned subsidiary of ICC. The merger was effected as proposed on December 24, 1979.
The plan provided that the Datron common stockholders would be paid $1.25 per share. The figure had been determined by a major investment banking firm retained by ICC to provide an independent appraisal. A member of that firm who was defendants' expert at the trial testified that his firm's assignment was to deliver its opinion as to a fair price rather than to marshal evidence in support of any prior valuation made by defendants.
Plaintiff, who owned 1,000 shares of Datron's common stock, was the only one of 470 minority holders  other than those not contacted because of a change of address  who did not tender his shares and accept the payment offered. He was of the *196 opinion that $1.25 a share was not "fair value" and instituted this suit to recover the difference between the offer and what he deemed to be the fair value of the stock.
Originally, his complaint charged Datron, ICC and several individual defendants with self-dealing and with a violation of their fiduciary duties. Those allegations were abandoned prior to the pretrial conference, however, and the sole issue litigated was whether the shareholders as a class had received "fair value," the action having been certified as a class action on behalf of all of the minority shareholders. Defendants acknowledged that they  not the plaintiffs  had the burden of proof on that issue.
The "burden of establishing the fairness of the transaction" in merger litigation is always "on those seeking to uphold the merger," Brundage v. New Jersey Zinc Co., 48 N.J. 450, 477 (1967), because those
... who control the affairs and conduct of a corporation, whether public or private, have a fiduciary duty to all the stockholders and the powers they have by virtue of their majority status are powers held by them in trust. [citation omitted] They cannot use their powers for their own personal advantage and to the detriment of minority stockholders. Berkowitz v. Power Mate Corp., 135 N.J. Super. 36, 45 (Ch.Div. 1975).
A fairness controversy, in effect, tests whether that fiduciary duty has been breached and it is only logical that the burden should be on the fiduciaries to justify that they have not violated their trust.
While there is "no inflexible test as to what fairness is * * *," Brundage v. The New Jersey Zinc Co., supra, 48 N.J. at 482, an assessment of fair value requires consideration of "proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissable in court." Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983), rev'g, 426 A.2d 1333 (Del. Ch. 1981).
To adjudicate fairness, therefore, a court must first consider separately the alternate methods of valuation proposed and then assign to each the evidentiary weight it deserves in the *197 context in which it is being offered. See Annotation, Valuation of stock of dissenting stockholders in case of consolidation or merger of corporation, sale of its assets, or the like, 48 A.L.R.3d 430 (1973).
As was pointed out in Sterling v. Mayflower Hotel Corp., 33 Del. Ch. 293, 93 A.2d 107 (1952):
* * * all relevant value factors must be considered in arriving at a fair value * * * But the requirement that consideration be given to all relevant factors entering into the determination of value does not mean that any one factor is in every case important or that it must be given a definite weight in evaluation * * the relative importance of several tests of value depends on the circumstances.
Defendants' expert testified that in arriving at the $1.25 per share buy-out figure he first assembled data by making an independent investigation, an examination of published materials and a statistical comparison of other corporations in the same general size range and that he then submitted that data to five tests of value. He approached the information he had compiled from the viewpoint of (1) book value, (2) liquidation value, (3) earnings value, (4) discounted cash flow value and (5) market value.
The book value and liquidation value approaches produced the two least reliable results. At book value the stock was valued at minus 35 cents a share; liquidation value likewise was only a nominal sum. Defendants' expert said he gave no weight to either approach. See Brundage v. New Jersey Zinc Co., supra, 48 N.J. at 479, and Sterling v. Mayflower Hotel Corp., supra, 93 A.2d at 115. See, also, Homer v. Crown Cork & Seal Co., 155 Md. 66, 141 A. 425 (1928).
The earnings and discounted cash flow analyses, on the other hand, were far more comprehensive, treated important factors ignored in the book value and liquidation value approaches and yielded more equitable results.
Both techniques are generally intended to quantify a stock's investment worth to a shareholder through an estimation of the return the shareholder may reasonably be expected to realize. *198 Traditionally this has been recognized to be a significant appraisal consideration.
In In Application of Delaware Racing Ass'n, 42 Del. Ch. 406, 213 A.2d 203 (1965), the court observed that
... dividends paid or the possibility of them being paid in the future, is of especial significance in questions of valuation since receipt of dividends is ordinarily the most usual way for the stockholder to realize upon the value of his stock.
In an earnings analysis, the value of a stock is conceptualized as the product of the corporation's representative earnings multiplied by a number derived from an aggregation of the price/earnings ratios of comparable stocks. The approach is only reliable, however, if it also reflects any diminution in a stock's worth because of priority obligations that may preclude shareholders from participating in anticipated profits in the immediate future.
The discounted cash flow method necessarily takes such realities into consideration. This method may simplistically be described as evaluation of a stock in terms of the present value of the income stream it may be expected to produce, factored for the element of risk inherent in the enterprise. It is a recognized approach to value in "fairness" litigation. Weinberger v. UOP Inc., supra, 712.
The earnings approach, as employed here by defendants' appraiser, recognized that Datron had a modest potential for growth. However, as of the date of the merger, its arrears on dividends payable to preferred shareholders totalled nearly $10,000,000 and its arrears on cumulative preferred shares were accruing at an annual rate of more than $1,000,000.
Even if the optimistic earnings projections were realized, the necessity of meeting the priority obligations together with the need to generate working capital to maintain the enterprise could reasonably have been anticipated to absorb Datron's profits for the decade following the merger.
*199 Consequently, when Datron's earnings were fully "diluted" to reflect the reality of Datron's equity structure, defendants' appraiser arrived at the factually supported conclusion that from an earnings approach the maximum value that could be projected for Datron's stock was $1. Under the discounted cash flow approach, the stock was said to be fairly priced in a range between 81 cents and $1.00.
The final appraisal method utilized by defendants' expert was market price analysis. While that value alone cannot be determinative of the fairness of compensation to minority shareholders, Berkowitz, supra, 135 N.J. Super. at 49, it is a valuable corroboration tool.
While payment above market price does not automatically translate into fairness, it does represent a factor in valuation which properly may be taken into account when a stock is publicly traded as in the present case. See discussion of market value evidence in Brundage, supra, 48 N.J., at 482.
Defendants' expert considered Datron's over-the-counter market price and found that the stock's highest market price, slightly over $1.00, served to corroborate his conclusions as to the stock's value under earnings and cash flow analysis.
In contrast, plaintiff's expert arrived at a value of $7.70 for the stock by utilizing only one approach, earnings analysis. Since it was the most significant test under the circumstances, he cannot be faulted for ignoring the others. However, his analysis was seriously flawed in other respects.
First, the corporations he selected for comparison were not fairly comparable. Most were established industrial companies operating on a scale four times larger than Datron. This enabled them to enjoy price/earnings ratios which Datron could never hope to achieve and to have total sales and assets wholly disproportionate to those of Datron. See Berkowitz, supra, 135 *200 N.J. Super. at 49, rejecting an expert's testimony based on comparisons which were "surely not a barometer by which one can or should measure the fairness of the price offered."
Second, in selecting reported earnings and price/earnings ratios for use in this calculation, he arbitrarily mixed figures from different time periods, seriously undermining the legitimacy of his equation. For example, in one instance he conceded that he had utilized a price/earnings ratio taken from a "look in the newspaper the day I did the analysis," which was almost two years after the date of the controverted transaction.
Third, his earnings projections were based in large part on speculation as to Datron's prospects for future participation in "embryonic markets" which he said were "going to materialize over the next decade" if technological progress took the course he forecast. The result was a shaky view of present value based only on unpredictable expectations and crossed-finger hopes.
Plaintiff tried to justify his conjectural approach on the basis of Perlman v. Feldmann, 219 F.2d 173 (2d Cir.1955), on remand 154 F. Supp. 436 (D.Conn. 1957), where projections of future earnings were weighted to the exclusion of other factors in assessing the fairness of a transaction affecting minority shareholders. The level of speculation, however, was sharply reduced in that case which dealt with a projection of a steel manufacturing corporation's prospects in the context of heightened wartime production demands created by the Korean conflict.
Moreover, the holding is somewhat of an aberration. It appears to be the only reported case which has sanctioned present value conclusions based solely on future earning projections. Traditionally such opinions have been rejected as too unreliable. See David J. Greene & Co. v. Dunhill International, Inc., 249 A.2d 427 (Del. Ch. 1968). That appears to be the better view, but, in any event, the rationale of Perlman is not applicable under the "particular circumstances" of the present controversy *201 where the future market is so theoretical. Brundage, supra, 48 N.J. at 382.
Fourth, his treatment of the preferred stock dividend arrearages was pure double-speak. Rather than dilute his calculation of Datron's potential earnings so as to reflect the impact of the arrearages on the income which common shareholders could actually expect to realize, he merely deducted the arrearages, measured on a per share basis, from what he considered to be the fair price of the stock had the arrearages not existed.
He measured the stock as having an earnings gross value of $9.60 a share. From that figure, he deducted $1.72, which represented the per share dividend arrearage, and arrived at his value figure of $7.70 a share.
There was no proof that the procedure was an approach generally recognized in the financial community. To the contrary, it appeared that the method comported with no standard of reason.
Overall, the testimony of plaintiff's expert was exaggerated, inconsistent and contrived to maximize the accusation of unfairness. It was based on unfounded speculation and faulty methodology rather than upon a rational analysis of financial data. Weinberger, supra, 457 A.2d at 713. I find it was not deserving of any weight.
In contrast, defendants' comprehensive approach relied on techniques generally acceptable in the financial community. In my view, defendants satisfied their burden of establishing the fairness of the transaction. They demonstrated that each minority shareholder of Datron was offered "his proportionate interest in a going concern." Tri-Continental Corp. v. Battye, 31 Del. Ch. 523, 74 A.2d 71, 72 (1950). The value they fixed for the Datron stock was fair.
Judgment shall be entered today for defendants and against plaintiff.