734 A.2d 721

EMANUEL BALSAMIDES, SR., EMANUEL BALSAMIDES, JR. AND THOMAS BALSAMIDES, PLAINTIFFS–APPELLANTS, v. PROTAMEEN CHEMICALS, INC., ADAM PERLE, DANIEL PERLE, MANLEN REALTY CORP. AND RELCO CHEMICAL CO., INC., DEFENDANTS, AND LEONARD M. PERLE, DEFENDANT–RESPONDENT.

Argued May 3, 1999—Decided July 14, 1999.

*Alan S. Pralgever,* argued the cause for appellants (*Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone,* attorneys; *Mr. Pralgever, Stuart L. Pachman* and *John A. Snyder, II,* on the briefs).

*Martin N. Crevina,* argued the cause for respondent (*Buckalew, Frizzell & Crevina,* attorneys; *Mr. Crevina* and *Robert J. Buckalew,* on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal arises out of an acrimonious relationship that developed between two former friends and close business associates, Emanuel Balsamides, Sr. (Balsamides) and Leonard M. Perle (Perle). The two men were each fifty percent shareholders of Protameen Chemicals, Inc. (Protameen or the Company), a corporation that supplies chemicals to the cosmetics industry. Following a series of spiteful and abusive actions by Perle, Balsamides petitioned the court for dissolution of the corporation, pursuant to *N.J.S.A.* 14A:12–7, the "Oppressed Shareholder Statute." The court ordered Perle to sell his shares in Protameen to Balsamides.

The primary issue in this appeal is whether in this judicially ordered buy-out the trial court should have applied a "marketability discount" to determine the "fair value" of Perle's shares.[1] We also determine whether the Appellate Division exceeded its scope of review by remanding the case to the trial court for reconsideration of its valuation of Perle's interest in Protameen.

I.

A.

Perle and Balsamides went into business together more than twenty-five years before this suit was filed. Because of their complementary areas of expertise, they were the ideal team. Balsamides, using the contacts he had made over the years as a purchasing agent for Revlon Corporation, became Protameen's

---

[1] "Fair value," as used in *N.J.S.A.* 14A:11–3, the "Appraisal Statute," is addressed in *Lawson Mardon Wheaton, Inc. v. Smith,* 160 *N.J.* 383, 734 *A.2d* 738 (1999), also decided today.

"outside man," to build the company's sales base. Perle, with his background in chemistry, became the company's "inside man," responsible for the technical and administrative sides of the business. In addition to sales management, Balsamides was responsible for advertising, marketing, and insurance; Perle provided technical support for staff and customers, and handled purchasing and office management.

The partners worked hard, and Protameen became a very successful business. By mid–1995, the company's gross sales exceeded $19 million. Protameen employed more than a dozen people and used seven warehouses.[2] Perle and Balsamides each had an annual income between $1 million and $1.5 million.

The trouble began in the late 1980s, when each man brought two sons into the business.[3] Apparently, they expected that the sons eventually would assume ownership and management of the Company. Balsamides's sons, and Perle's oldest son Adam, started working for the company in 1987. Daniel Perle joined them in 1989. Balsamides's sons started in sales and were paid very well. They received commissions, expense accounts, and company cars, as did other Protameen salesmen. At Perle's insistence, his sons started in administrative and office management positions, his area of expertise. Nevertheless, Perle believed his sons should receive the same compensation as Balsamides's sons. The hostilities were spurred by that issue.

---

[2] Manlen Realty Corp. (Manlen) also was owned by Perle and Balsamides as equal shareholders. Manlen owns the real property on which Protameen operates. Relco Chemical Company (Relco) was a corporation owned in equal shares by Balsamides's two sons, Emanuel Balsamides, Jr. (Manny, Jr.) and Thomas Balsamides (Thomas), and Perle's two sons, Adam Perle (Adam) and Daniel Perle (Daniel). Relco was designed to conduct essentially the same type of business as Protameen, but on a much smaller scale. All three companies were New Jersey corporations.

[3] "Plaintiff" or "defendant" refers to Balsamides and Perle. "Plaintiffs" or "defendants" refers to them and their sons.

Eventually, both of Perle's sons were moved into sales. Adam began in 1990, and Daniel a short time prior to this litigation. By that time, however, it was too late. The feuding already had begun and encompassed both the sons and their fathers. Conditions at Protameen deteriorated to the point where both sides compared the judicial separation they sought to a "divorce," and one described the blood feud in which they were engaged as a "reenactment of the Hatfields and the McCoys."

### B.

In June 1995, Balsamides sought relief as an oppressed minority shareholder under *N.J.S.A.* 14A:12–7. He filed a Verified Complaint, and Order to Show Cause with Temporary Restraints, against Perle, Perle's sons, and Protameen, Manlen, and Relco for immediate and permanent injunctive relief, for the appointment of a fiscal agent to operate the three corporations, and for the dissolution of the corporations. On July 20, 1995, the trial court entered a preliminary injunction and ordered that: all parties were to have equal access to business and computer records and to the corporation's premises;[4] business decisions were not to be made without the concurrence of both Balsamides and Perle; and Perle was to provide Balsamides, weekly, with a complete list of all new accounts and new orders, and the names of the salesmen to whom that new business had been given.

The trial court initially refused to appoint a provisional director. It changed that decision after physical violence broke out on Protameen's premises between two employees who had taken opposite sides in the dispute. The following day, the trial court appointed a provisional director and ordered that a security guard be assigned to the premises to enable the continued operation of

---

[4] The Order to Show Cause denotes Protameen, Manlen and Relco as "the Corporations," and speaks in terms of all three of them. The trial court's order refers to "the Corporation" without definition. His decision indicates that he refers to all of the corporations wherever that interpretation makes sense.

the business, and to prevent employees from being attacked physically.

On July 31, 1995, defendants filed an Answer to plaintiffs' Complaint, denying the allegations, and a Counterclaim seeking the sale of Protameen to a third party. The trial court directed Balsamides to cooperate with Perle in finding a third-party purchaser for the company.

Between November 1995 and February 1996, the trial court held a nineteen-day trial. The primary witnesses were Balsamides and his sons, Perle, and the parties' respective experts. Balsamides and his sons testified about the offenses they claimed Perle and his sons had committed. Perle, in turn, testified about alleged wrongful acts he claimed the Balsamideses committed against him and his family.

At the end of plaintiffs' case, upon defendants' motion, the court dismissed the claims against Adam and Daniel Perle. The court also dismissed Manny, Jr. and Thomas Balsamides' claims against Leonard Perle. At the end of defendants' case, the court dismissed defendants' counterclaims for damages. Thus, the only claims remaining at the end of trial were Balsamides' claims against Perle for breach of fiduciary duty, for which he sought dissolution of their companies, compensatory damages, punitive damages, attorneys' fees and litigation costs, and Balsamides' sons' claims regarding Relco.

The trial court found that Balsamides was an oppressed shareholder under *N.J.S.A.* 14A:12–7 and was entitled to buy out Perle's interest in Protameen and Manlen for $1,960,500.[5] Although recognizing that the "Balsamides group [was not] entirely blameless in this entire controversy," the court found that any wrongdoing by that group was not intentional in nature and was

---

[5] If Balsamides was unable or unwilling to buy Perle's share of Protameen and Manlen, Perle would be given the opportunity to buy out Balsamides at the same price and terms. If Perle was unable or unwilling to buy, the Company would be put on the market and sold to a third party.

not injurious to the company's business. The court concluded that Perle, on the other hand, had "conducted himself in his vendetta against Balsamides in a way that was harmful to the business of Protameen, and [he] displayed little or no regard for the welfare of his own company and the interests of his partner."

The witnesses' credibility and their demeanor were central to the court's conclusions. The court observed that Perle's "demeanor on the witness stand . . . told a story louder and more clearly than any of the words spoken during the course of this trial. His quest for equality for his sons and his resentment completely blinded him to the practical implications of what he was doing."

Although noting that Perle had committed some trivial transgressions and engaged in unilateral decisionmaking that harmed the company, the court expressly stated that its decision to order a buy-out was not based on those factors. Specifically, the court deemed trivial Perle's antiquated inventory system, his lack of quality control, his attempts to sell his interest to a third party, and his efforts to bolster Adam Perle's efforts in Florida (except where those efforts were in violation of the B.F. Goodrich distribution agreement). Numerous other actions by Perle, on the other hand, were not trivial and constituted a breach of his fiduciary responsibility as a co-equal shareholder, amounting to shareholder oppression. Specifically, the court concluded that the following acts by Perle constituted oppression: Perle's purposeful refusal or delay in providing technical information required for plaintiffs' customers; his refusal to provide product samples when requested by plaintiffs' customers; his refusal to stock inventory that he knew plaintiffs' customers would be ordering; his assent to his son Adam's sale of carbopol in Florida in violation of Protameen's distribution agreement with B.F. Goodrich, a major customer of the Company; his denial of plaintiffs' access to the Company's computer system; and his disparaging treatment of plaintiffs in front of Protameen's personnel and his condoning of similar actions by his sons. The court found that Perle intended those actions to embarrass plaintiff and harm plaintiff's relationship with

his customers. *Balsamides v. Perle,* 313 *N.J.Super.* 7, 14, 712 *A.*2d 673 (App.Div.1998).

The court considered the alternatives to a forced buy-out. It rejected the idea of dissolving the corporation and selling its assets, concluding that the Company was worth significantly more as a going concern. Although Robert Pettus had offered to purchase the Company for $7.5 million in November of 1996, the court found the offer too speculative and tentative to be given any credence. The court further found that sale of Protameen on the open market would be no less speculative and uncertain. Even if the court "first attempt[ed] to preserve the integrity of the corporation by appointing a provisional director, ... the corporation would have to be sold or have one partner buy out the other." *Balsamides, supra,* 313 *N.J.Super.* at 14, 712 *A.*2d 673.

After considering all the alternatives, the court concluded:

> It is my judgment that Leonard Perle should be required to sell his interests in Protameen to Emanuel Balsamides. That is the remedy that I consider to be the fair, just, and equitable remedy in these circumstances. The buy-out of one co-owner by the other seems to me to present the greatest possibilities of resolving this matter in the near future, of maximizing the benefit to both parties, and in preserving Protameen and its business to the greatest extent possible ....

The court based its decision on the belief that Perle was more at fault; that the Company's dynamic growth primarily resulted from Balsamides's skill and connections; and that most members of the cosmetic industry viewed Balsamides as the "face" of Protameen.

In calculating the "fair value" of Perle's shares, the court concluded that the "methodology and process" proposed by plaintiffs' expert, Thomas J. Hoberman, was more reliable and his evaluation more credible than that of defendants' expert, Robert E. Ott.

Using an "excess earnings" method of valuation, Hoberman determined that Protameen had a value of $4,176,400, after applying a thirty-five percent marketability discount. Ott, using a combination of "market" and "income" approaches, valued the Company at $8,000,000. He did not apply a marketability dis-

count, concluding it was inappropriate because the court was directing the stock buy-out.

The court specifically rejected Ott's analysis, stating:

Mr. Ott's reasoning was that when the court provides the market by ordering a buy-out, there need be no concern for marketability and no discount for marketability. I disagree with Mr. Ott completely in that approach. The exercise of evaluation is not directed to determine the value of Protameen in light of a court ordered buy-out. It is to determine the intrinsic value of the business. Its value does not change simply because the court happens in this case to direct a buy-out. The investigation by the two experts should have been an investigation to determine the value, the proper value, the market value of Protameen at the time they were using.

The court also declined to enforce the three-year restrictive covenant contained in the 1978 Stockholders' Agreement. Instead, the court imposed a one-year, geographically unlimited, non-competition restrictive covenant on Perle. No non-competition restrictions were placed on Perle's sons.

When the decision was rendered, Balsamides became the equitable owner of Protameen and Manlen. Balsamides was ordered to pay approximately $1.96 million for Perle's interest in Protameen and Manlen, after adjusting for the negative value of Manlen.[6] Perle continued receiving his share of profits and salary until completion of the sale. The court enjoined Perle from entering Protameen's premises except to remove his belongings with Balsamides's permission and accompanied by Balsamides's representative.

The court denied plaintiffs compensatory damages, finding their proof inadequate. It also did not award plaintiffs' counsel fees or

---

[6] The court determined that Manlen had a "negative value" of $255,000, by which amount the Protameen valuation would be reduced when calculating a buy-out number.

The court made no decision on Relco, the company owned by the four sons. As the court noted, no evidence about that company had been produced; it seemed to be little more than the structure or shell of a corporation established purely for future use. The court suggested that the owners should privately dissolve that corporation, sell the assets if there were any, and divide the proceeds.

explain its reason for declining to award fees, even though plaintiffs' had requested counsel fees in their complaint. The court reserved judgment on punitive damages against Perle.

Shortly thereafter, the court issued a supplemental decision, in which it detailed a payment schedule for the purchase by Balsamides of Perle's interest in the businesses. It issued another supplemental decision on May 15, 1996, in which it assessed punitive damages against Perle in the amount of $75,000.

Perle (without his sons) filed a Notice of Appeal, seeking reversal of the trial court's decision on the grounds that it erred in valuing Perle's share of Protameen and in assessing punitive damages. Balsamides cross-appealed on the basis that he should have been awarded counsel fees and that the one-year restrictive covenant was too short and should have been extended for the full three years contemplated by the Stockholders' Agreement.

## C.

The Appellate Division affirmed the buy-out order as being consistent with *N.J.S.A.* 14A:12–7(1)(c). It also affirmed the terms of the restrictive covenant imposed on Perle, and the punitive damages assessed against him. *Balsamides, supra,* 313 *N.J.Super.* at 29–33, 712 *A.*2d 673. The panel specifically disagreed with the trial court's application of a marketability discount and remanded the valuation question, as well as determination of counsel fees.

While acknowledging the limited scope of appellate review, *id.* at 13, 712 *A.*2d 673, and the deference generally due a trial court's acceptance or rejection of an expert's valuation opinion, *id.* at 19, 712 *A.*2d 673, the Appellate Division nonetheless rejected certain aspects of the trial court's valuation of Protameen. The panel concluded that the trial court erred in completely rejecting Ott's valuation method and accepting Hoberman's, particularly where the method accepted, the "excess earnings" method, was disfavored by the Internal Revenue Service. *Id.* at 21–22, 23, 712 *A.*2d 673. It remanded for the trial court to reconsider its acceptance

of the eleven percent rate of return on net tangible assets and the thirty percent capitalization rate that plaintiffs' expert had used in his valuation. Specifically, the Appellate Division questioned the "six factors" Hoberman had used to justify the capitalization rate. *Id.* at 23–24, 712 *A.*2d 673. It also instructed the trial court to reconsider whether allowing Perle's sons to compete freely with Protameen would have an appreciable effect on the Company's value, thereby affecting the capitalization rate. *Id.* at 25–26, 712 *A.*2d 673.

The most important disagreement, however, concerned the trial court's use of a thirty-five percent marketability discount in valuing Perle's stock. The Appellate Division did not dispute the usefulness of the marketability discount as a general rule. However, it disagreed with its propriety in these circumstances. *Id.* at 26, 712 *A.*2d 673. In the court's view,

[t]he problem with applying such a discount in this case is that there was no sale of Perle's stock to the general public nor was Balsamides buying an interest in the company, minority or otherwise, that might result in the later sale of a partial interest to a member of the public. Rather, this was a case of a fifty percent owner buying the stock of the other fifty percent owner, resulting in the buyer obtaining total ownership of the corporation. The appraisal by Hoberman, accepted by the court, with all of its deductions for adverse internal and market conditions, was aimed at determining the fair market value of the entire corporation if that corporation were to be sold. Applying a marketability discount to reduce that valuation flies in the face of the initial valuations of both Hoberman and Ott of 100% of the corporation.

[*Id.* at 27–28, 712 *A.*2d 673.]

Accordingly, the Appellate Division remanded the matter to the Chancery Division for reconsideration of the valuation of Perle's interest in Protameen in light of its opinion. *Id.* at 33, 712 *A.*2d 673. It also remanded on the issue of counsel fees, which had been raised at trial but not addressed in the trial court's decision. *Ibid.*

Judge Wecker, in her concurrence, agreed that Protameen had been undervalued substantially. In her view, however, the undervaluation was due solely to an improper application of the marketability discount and she would not have disturbed the trial court's conclusions regarding any other issue. All were "subjects of

credible though disputed evidence." *Id.* at 34, 712 *A.*2d 673 (Wecker, J., concurring). She wanted to make clear, since she thought the majority opinion did not, that a marketability discount might, under some circumstances, be applicable to sole ownership of a close corporation. *Ibid.*

The Balsamideses petitioned this Court for certification, seeking reversal of the Appellate Division's decisions to reject the use of a marketability discount and to remand for reconsideration of Protameen's valuation. Perle cross-petitioned. He opposed the relief sought by Balsamides, and sought review of the Appellate Division's remand with respect to counsel fees and its affirmance of the punitive damages assessment. We granted Balsamides's petition, 156 *N.J.* 425, 719 *A.*2d 1023 (1998), and denied Perle's cross-petition. *Ibid.*

## II.

The principal issue in this case is valuation. *Balsamides, supra,* 313 *N.J.Super.* at 16, 712 *A.*2d 673. Specifically, the controversy centers on the valuation reports and methods used by the parties' respective experts: Thomas Hoberman, a certified public accountant, who represented Balsamides; Robert Ott, a Chartered Financial Analyst, who represented Perle. While acknowledging that the market, income, and cost approaches to valuation were preferable, Hoberman testified that he had insufficient data to use those methods. Therefore, he used the "excess earnings" method to value Protameen.

Under the "market approach," the subject company is analyzed in relation to comparable companies traded on an "open free market." Hoberman testified that he found no companies truly "comparable" to Protameen. He could not use direct competitors because each company did its own research and development, making them inherently dissimilar. He found four companies that used the same Standard Industrial Classification number as Protameen, with similar sales revenue, but they had many more employees than Protameen. In addition, according to Hoberman,

Protameen operated more like a company with only $1 million to $2 million in sales. It did not use computer software to maintain its accounting and inventory records; they still were kept manually, with ledger sheets and index cards.

Hoberman also rejected the "income approach." The income approach accounts for value based on future net income or cash flow. To use it, the appraiser must be able to project income or cash flow for the coming five-year period. Because Hoberman was not permitted to interview Perle, he was unable to make credible projections, especially for anticipated capital expenditures. Hoberman rejected the cost approach because it produced a value lower than that calculated using the "excess earnings" approach.

Hoberman ultimately applied the "excess earnings" method of valuation. He testified that there was no better method to value Protameen, and that such a method "generally" was used to value closely-held companies and professional practices. The "excess earnings" method or "formula method," is described in Rev. Rul. 68–609, 1968–2 C.B. 327, 1968 *WL* 15211, as follows:

A percentage return on the average annual value of the tangible assets used in a business is determined, using a period of years (preferably not less than five) immediately prior to the valuation date. The amount of the percentage return on tangible assets, thus determined, is deducted from the average earnings of the business for such period and the remainder, if any, is considered to be the amount of the average annual earnings from the intangible assets of the business for the period. This amount (considered as the average annual earnings from intangibles), capitalized at a percentage of, say 15 to 20 percent, is the value of the intangible assets of the business determined under the "formula" approach.

The *Revenue Ruling* also states that the "excess earnings" approach may be used "only if there is no better basis therefor available."

In applying the "excess earnings" method, Hoberman first determined earnings for the previous five and a half years, based on the Company's financial statements. He then calculated the average weighted earnings from December 1990 to June 1995 as $1,195,659, and the average annual weighted value of the Company's net tangible assets as $2,786,949. Because Protameen had

been growing rapidly in the previous few years, Hoberman weighted the recent years most heavily when he projected future earnings and future value.

Next, Hoberman applied an eleven percent rate of return to the average annual weighted value of the net tangible assets. According to his report, eleven percent "reflects the rate of return that would be required on the tangible assets in order for the Company to service its debt, if management decided to leverage the assets, and cover its operating overhead." The calculated return on tangible assets was $306,564 (eleven percent of $2,786,949). Hoberman deducted that average return on tangible assets ($306,564) from the average weighted earnings for the corporation ($1,195,-659), and was left with $889,094 in additional earnings. That figure represents the average annual earnings from intangible assets, or the average "excess earnings" of the corporation for the five years preceding the valuation. Hoberman capitalized the average "excess earnings" at a rate of thirty percent, resulting in projected "excess earnings" of $2,963,657. In order to determine the value of the corporation before applying the marketability discount, Hoberman projected the net value of the corporation's tangible assets as of the date of valuation at $3,461,583. To the tangible asset value, he added $2,963,647 (the "excess earnings" capitalized at thirty percent) for a total value of $6,425,230. Hoberman testified that he used a rate of return and capitalization rate higher than average to account for the inherent risks in small companies generally and the specific risks, listed *infra*, at 370, 734 A.2d at 731, associated with Protameen.

Finally, Hoberman applied a thirty-five percent marketability discount to the calculated total value. He testified that, according to studies, thirty-five percent was a mid-range or conservative discount rate. Hoberman estimated Protameen's final value to be $4,176,000.

Ott, Perle's expert, used both the income approach and the market approach, but relied heavily on the income approach. He testified that use of the cost or "excess earnings" approach would

be inappropriate under the circumstances. The income approach seeks to determine the present value of all future earnings or, more accurately, the present value of the Company's future cash flow. Thus, the income approach calculates the equilibrium price at which a buyer will buy and a seller will sell. To determine Protameen's equilibrium price, Ott first computed normalized net income after taxes. He then added back noncash items (such as depreciation) to obtain the historical cash flow. The historical cash flow was used to project future cash flow. In projecting, Ott based future capital expenditures on Protameen's historical spending. (That is the information that Hoberman was missing.) Those calculations yielded "free cash flow"—the cash that would be available to a buyer.

Annualizing the results through October 1995, Ott found free cash flow for 1995 to be $909,244. Ott incorporated industry trends, economic forecasts, future growth and expense forecasts, and discussions with management into the projected free cash flow. He calculated the present value of free cash flow over the next five years to be $3,526,110. He projected Protameen's residual value (obtained by projecting free cash flows from the fifth year to infinity using a formula) to be $4,537,605. Consequently, the present value of all future free cash flows totaled approximately $8,063,000. According to Ott, that was the Company's value under the income approach.

Ott verified his findings with the market approach. He identified four public companies engaged in chemical distribution and compared them with Protameen. Based on the value of those companies, Protameen was worth $13,600,000. Recognizing, however, that there were no truly comparable companies, Ott did not treat this result as an actual estimate of Protameen's value, but as a "sanity check" to his income approach and as evidence that Protameen had significant value.

Ott also testified to several disagreements with Hoberman's valuation. First, he disagreed with Hoberman's use of the "excess earnings" approach, which he stated was the least desirable

method of valuation. He also objected to the six-year time frame on which Hoberman's projections were based, because Protameen produced lower earnings during the early portion of that period. Subsequently, Protameen exhibited significant growth. He, therefore, used a three-year unweighted average. He also testified that Hoberman erroneously capitalized earnings before taxes, rather than after taxes. Hoberman also normalized Perle's salary but not Balsamides's salary. *Balsamides, supra,* 313 *N.J.Super.* at 18, 712 *A.*2d 673. Ott also objected to the eleven percent rate of return applied to tangible assets and to the thirty percent capitalization rate. Ott considered those rates too high, because of the Company's significant positive growth. *Ibid.* He used rates of nine and eighteen percent, respectively.

His strongest disagreement, however, was with the thirty-five percent marketability discount. Ott stated such a discount was not appropriate when valuing one hundred percent of a company. *Id.* at 18–19, 712 *A.*2d 673. He testified that only a nominal discount was warranted, perhaps seven percent to reflect a brokerage fee. *Id.* at 19, 712 *A.*2d 673.

Accordingly, Ott valued the company at $8,285,000, using both the market and income approaches, but relying primarily on the income approach. Thus, the experts' values for Protameen ranged from Hoberman's $4,176,000 to Ott's $8,285,000, further demonstrating that valuing a closely-held corporation is more an art than a science.

### III.

Balsamides asserts that by rejecting some of the trial court's findings with respect to his expert's valuation method, the Appellate Division exceeded the allowable scope of its appellate review. In *Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974), we stated:

Considering first the scope of our appellate review of judgment entered in a nonjury case, as here, we note that our courts have held that the findings on which it is based should not be disturbed unless " * * * they are so wholly insupportable as to

result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter.... That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence.

[Citations omitted].

That standard is particularly significant in valuation disputes, which frequently become battles between experts. *Rapid–American Corp. v. Harris,* 603 *A.2d* 796, 802 (Del.1992). The findings of the trial court are critical as the valuation of closely-held corporations is inherently fact-based. Rev. Rul. 59–60, C.B.1959–1. In other words, valuation of closely-held corporations is not an exact science. *Lavene v. Lavene,* 148 *N.J.Super.* 267, 275, 372 *A.2d* 629 (App.Div.), *certif. denied,* 75 *N.J.* 28, 379 *A.2d* 259 (1977). There is no right answer.

■ Experts exercise judgment at many stages in the valuation process. As a result, their credibility and reliability are critical. Only the trial court has the opportunity to see, hear, and question the expert witnesses. Additionally, in complicated proceedings such as this, the trial court's findings on valuation typically are only one aspect of the overall resolution of the matter. Appellate courts should take care in accepting some and rejecting other findings of the court, as that may disturb the logic and equitable balance of the trial court's other conclusions. Accordingly, great deference is due a trial court's finding, which "will not be disturbed unless it is clearly erroneous or shows an abuse of discretion." Madeline Marzano–Lesnevich & Francine Del Vescovo, *The Minority Discount,* 18 *N.J. Fam. Law* 338, 339 (1998).

Whether the Court exceeded the allowable scope of its review by remanding to the trial court to reconsider Hoberman's use of the "excess earnings" approach, the eleven percent rate of return on tangible assets, and the thirty percent capitalization rate is a close question. We find that a careful reading of the Appellate Division's opinion discloses that it did not find that the trial court

had abused its discretion, but merely sought a clarification of some of that court's findings on Hoberman's methods.

■ We find adequate support in the record for the trial court's approval of Hoberman's use of the "excess earnings" method. Both Hoberman and the trial court recognized that "excess earnings" was not the preferred method of valuation. The court noted that although not preferred, "excess earnings" is an acceptable method, and Hoberman chose it, in part, because defendants would not provide the information needed to employ any other method. We are not convinced that by plaintiff's counsel deposing Perle that Hoberman could have received the data required to use the income approach; given the acrimony between the parties, it certainly would not have been acquired without a great deal of difficulty. Accordingly, the trial court did not abuse its discretion by accepting Hoberman's use of the "excess earnings" approach as the best approach available. At this point in the litigation, the trial court's conclusion on that issue should not be disturbed.

*Revenue Ruling* 68–609 states that in using the "excess earnings" approach:

> The percentage of return on the average annual value of the tangible assets used should be the percentage prevailing in the industry involved at the date of valuation, or (when the industry percentage is not available) a percentage of 8 to 10 percent may be used.

> The 8 percent rate of return and the 15 percent rate of capitalization are applied to tangibles and intangibles, respectively, of businesses with a small risk factor and stable and regular earnings; the 10 percent rate of return and 20 percent rate of capitalization are applied to businesses in which the hazards of business are relatively high.

> The above rates are used as examples and are not appropriate in all cases. In applying the "formula" approach, the average earnings period and the capitalization rates are dependent upon the facts pertinent thereto in each case.

■ Because *Revenue Ruling* 68–609, *supra*, recommends a rate of return of between eight and ten percent, the Appellate Division questioned Hoberman's use of an eleven percent return on tangible assets. Hoberman explained that the difference resulted from Protameen's inability to obtain the prime rate. The best rate available to the Company was the prime rate plus two

percent, or eleven percent. Although this claim was disputed, we believe there was sufficient credible evidence to support Hoberman's position and would not disturb the trial court's findings.

The Appellate Division also questioned the trial court's acceptance of a capitalization rate as high as thirty percent in light of Ott's use of eighteen percent. *Balsamides, supra,* 313 *N.J.Super.* at 23, 712 *A.*2d 673. The trial court observed that Hoberman based his rate on six negative factors: (1) lack of a full-time chemist; (2) projected decline in the market for the Company's animal- and mineral-based chemicals over the next five to ten years; (3) use of purchasing policies that placed a priority on price over quality; (4) potential cancellation of Protameen's contract with B.F. Goodrich at any time; (5) reliance on six customers that accounted for twenty-seven percent of the sales; and (6) generation of nearly half the Company's sales by Balsamides. The Appellate Division observed that all of those factors could be corrected with Balsamides in full control of the Company. The panel also questioned why those six factors warranted a nine percent increase in the capitalization rate. Moreover, Hoberman relied primarily on information he received from Balsamides to establish those factors. The concerns that the Appellate Division noted with respect to the six factors appear to have merit. *Id.* at 23–24, 712 *A.*2d 673.

Again, the panel did not specifically find that the trial court abused its discretion by accepting the thirty percent capitalization rate, but ordered the trial court to reexamine the significance of the factors on remand and, perhaps, consider other factors. The court observed that one other potential factor for the court to consider is the possibility of competition from Perle's sons, who are not bound by a non-competition agreement. Additionally, the trial court cut Perle's non-competition agreement to one year. At oral argument, the Appellate Division was informed that Protameen has already lost customers to competition from the Perles. *Id.* Although recognizing that the covenants cannot be changed at this late date, the Appellate Division nevertheless suggested that

on remand those competition factors be considered in reassessing the thirty percent capitalization rate. *Id.* at 33, 712 *A.*2d 673. Those additional factors alone may be sufficient to justify the thirty percent capitalization rate. If on remand, the trial court still considers the thirty percent rate applicable, the Appellate Division should accept that court's conclusion.

## IV.

### A.

The trial court found, and the Appellate Division affirmed, that Balsamides was an "oppressed shareholder," as defined by *N.J.S.A.* 14A:12–7. That statute provides in pertinent part:

(1) The Superior Court, in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that

. . . .

(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors *or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.*[7]

. . . .

(8) Upon motion of the corporation or any shareholder who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.

(a) The purchase price of any shares so sold shall be their *fair value* as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, *plus or minus any adjustments deemed equitable by the court if the*

---

[7] Note that for the purposes of this statute, each of two fifty percent shareholders is a "minority" shareholder. Because a fifty percent shareholder cannot direct outcomes as a fifty-one percent shareholder can, he does not have "control" of the corporation. *See Balsamides, supra,* 313 *N.J.Super.* at 16, 712 *A.*2d 673; *see also Bonavita v. Corbo,* 300 *N.J.Super.* 179, 187–89, 692 *A.*2d 119 (Ch.Div.1996).

*action was brought in whole or in part under paragraph 14A:12–7(1)(c)* [oppression rather than deadlock].

(b) Within five days after the entry of any such order, the corporation shall provide each selling shareholder with the information it is required to provide a dissenting shareholder under section 14A:11–6, and within 10 days after entry of the order the purchasing party shall make a written offer to purchase at a price deemed by the purchasing party to be the fair value of the shares.

(c) If the parties are unable to agree on fair value within 40 days of entry of the order, the court shall make the determination of the fair value, and the provisions of sections 14A:11–8 through 14A:11–11 shall be followed insofar as they are applicable.

[<em>N.J.S.A.</em> 14A:12–7 (emphasis added) ]

*N.J.S.A.* 14A:12–7(8), the buy-out section, was added to the New Jersey Business Corporation Act by the 1973 amendments. See1973 *N.J. Laws* ch. 366 ¶ 67. The Oppressed Shareholder Statute recognizes that the most sensible remedy to resolve problems of deadlock, dissension, or oppression often will be to "effect a corporate divorce. It also recognizes that a purchase and sale of shares at a fair price may be more desirable to all parties than a dissolution." 2 John R. MacKay II, *New Jersey Business Corporations,* ¶ 14–6(d)(2)(a) (2d ed.1996).

In this case, the key question is whether Perle received "fair value" for the shares of stock he was judicially ordered to sell to Balsamides. Specifically, whether the trial court in calculating the "fair value" of his shares should have applied a discount reflecting the lack of marketability or nonmarketability of those shares ("marketability discount").

■ We first discuss what standard of review is appropriate in determining whether the trial court erred in applying the "marketability discount." A trial court's findings are entitled to great deference and will be overturned only if the trial court abuses that discretion. *Rova Farms Resort, supra,* 65 *N.J.* at 484, 323 *A.2d* 495. However, matters of law are subject to a *de novo* review.

■ In analyzing corporate law issues, we find Delaware law to be helpful. *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 398, 734 *A.2d* 738; *Pogostin v. Leighton,* 216 *N.J.Super.* 363, 373, 523 *A.2d*

1078 (App.Div.1987), *certif. denied,* 108 *N.J.* 583, 531 *A.*2d 1356, *cert. denied* 484 *U.S.* 964, 108 *S.Ct.* 454, 98 *L.Ed.*2d 394 (1987). In *Rapid–American Corp., supra,* 603 *A.*2d at 804, the Delaware Supreme Court held that the trial court's refusal to add a "control premium" to the publicly-traded equity value of the company should be reviewed *de novo.* Likewise, the determination of whether a "marketability discount" is applicable implicates a question of law, and also is subject to *de novo* review. *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 398, 734 *A.*2d 738; *Lawson Mardon Wheaton v. Smith,* 315 *N.J.Super.* 32, 54–55, 716 *A.*2d 550 (App.Div.1998); *Balsamides, supra,* 313 *N.J.Super.* at 26, 712 *A.*2d 673.

Before exploring the issue of marketability discounts, it is useful to understand the distinction between a marketability discount and a minority discount. A minority discount adjusts for lack of control over the business entity, while a marketability discount adjusts for a lack of liquidity in one's interest in an entity. Even controlling interests in nonpublic companies may be eligible for marketability discounts, as the field of potential buyers is small, regardless of the size of the interest being sold. *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 398–99, 734 *A.*2d 738. James Edward Harris, *Valuation of Closely–Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts,* 42 *Ark. L.Rev.* 649, 660 (1989); Edwin T. Hood, et al., *Valuation of Closely Held Business Interests,* 65 *UMKC L.Rev.* 399, 438 (1997). We note that Perle's expert, Ott, confused the concepts when he stated "a marketability discount is used only when trying to evaluate the interest of minority shares of stock."

To understand at what level the discounts are to be applied also may be significant:

It is important to note the distinction between applying a discount at the corporate level to one or more of the values initially determined in valuing the entire corporation, as opposed to applying a discount at the shareholder level after the corporation has been valued. Discounting at the corporate level may be entirely

appropriate if it is generally accepted in the financial community in valuing businesses.

[1 John MacKay II, *New Jersey Business Corporations*, § 9–10(c)(2), n.426 (citations omitted).]

## B.

■ We now address the meaning of "fair value" in the Oppressed Shareholder Statute. That term is not defined in either that statute or in the Appraisal Statute. Most interpretations have considered the term in the context of dissenters' rights. But, as one commentator has observed, there is no reason to believe that "fair value" means something different when addressed to dissenting shareholders (*N.J.S.A.* 14A:11) than it does in the context of oppressed shareholders (*N.J.S.A.* 14A:12). 1 MacKay, *supra*, § 9–10(c)(2) n. 426. *See also Robblee v. Robblee*, 68 *Wash. App.* 69, 841 *P*.2d 1289, 1294 (1992) (holding that "fair value" means the same in an oppressed shareholder action as in a dissenting shareholder action).

Until the adoption of the New Jersey Business Corporation Act, *N.J.S.A.* 14A:1–1 to –16.4 in 1968, New Jersey required dissenters in appraisal actions to be paid the "full market value" for their shares. However, the New Jersey Corporation Law Revision Commission

abandoned the more restrictive standard of "full market value" used in Title 14 [of the Revised Statutes, the pre–1968 corporate law], in favor of the broader and more flexible test of "fair value" found in the [the ABA's] Model [Business Corporation] Act. In most cases the shares to be appraised will not be readily marketable.

[1968 Commissioners' Comment to *N.J.S.A.* 14A:11–3.]

"Fair value," thus, is not synonymous with fair market value.[8]

In *Lawson Mardon Wheaton*, *supra*, 160 *N.J.* at 397, 734 *A.*2d 738, we recognized that "there is no inflexible test for determining

---

[8] *Revenue Ruling* 59–60, the key reference regarding valuation of closely held companies, determines "fair market value." It recounts the following definition from contemporaneous estate and gift tax regulations:

fair value" and that "an assessment of fair value requires consideration of 'proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'" 1 MacKay, *supra*, § 9–10(c)(1) (citing *Dermody v. Sticco*, 191 *N.J.Super.* 192, 196, 465 *A*.2d 948 (Ch.Div. 1983)) (quoting from *Weinberger v. UOP, Inc.*, 457 *A*.2d 701 (Del.1983), *rev'g* 426 *A*.2d 1333 (Del.Ch.1981)); *see also* 2 *ALI Principles*, Principles of Corporate Governance: Analysis and Recommendations, comment d to ¶ 7.22 at 305–06 (1994) (2 *ALI Principles* ).

In calculating the "fair value" of Perle's stock, the main question to be resolved is whether the corporation's value should be reduced by a marketability or other discount. As stated previously, marketability discounts reflect the decreased worth of shares of stock in a closely-held corporation, for which there is no readily available market. In *Lawson Mardon Wheaton, supra,* 160 *N.J.* 383, 734 *A*.2d 738, we addressed the applicability of marketability discounts when valuing dissenting shareholders' stock in a statutory appraisal action, pursuant to *N.J.S.A.* 14A:11–3.[9] We recognized that there is no clear consensus on whether a marketability discount should be applied in those circumstances. *Id.* at at 400–

---

[F]air market value [is] the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.
[Rev. Rul. 59–60, C.B.1959–1.]
Although *Revenue Ruling* 59–60 was disseminated originally for use in calculating estate and gift taxes, in 1965 its use was expanded to include all taxes. Its methodology currently is applied in some states to equitable distribution calculations. Madeline Marzano–Lesnevich & Francine Del Vescovo, supra, 18 *N.J. Fam. Law*, at 338. The Ruling lists a large number of factors that might be considered when valuing a closely-held business.

[9] We further recognized that valuation principles that are appropriate for appraisal actions are not necessarily useful in other contexts such as valuation of stock for tax and equitable distribution purposes. *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 399, 734 *A*.2d 738; 2 *ALI Principles*, comment e, to ¶ 7.22 at 312.

01, 734 *A.*2d 738. Nevertheless, based on our review of the history and policies behind dissenters' rights and appraisal statutes, we found most persuasive those cases holding that marketability discounts generally should not be applied in determining the "fair value" of a dissenting shareholder's stock in an appraisal action. *Id.* at 402, 734 *A.*2d 738. Of course, there may be situations where equity compels another result. *Ibid.*

There is even less consensus about whether discounts should be applied in oppressed shareholder actions. Although other jurisdictions are divided, the majority reject the use of discounts for lack of marketability or liquidity, and minority discounts. 2 MacKay, *supra,* § 14–6(d)(2)(d). Most of the cases deal exclusively with the minority discount and do not address the marketability discount; others do not distinguish the discounts. *Charland v. Country View Golf Club, Inc.,* 588 *A.*2d 609, 613 (R.I.1991) (finding that no minority and marketability discounts should be applied to purchase price of shares of fifteen percent shareholder when corporation elected to purchase his shares "at a price equal to their fair value."); *Robblee, supra,* 841 *P.*2d at 1294–95 (analogizing situation to dissenting shareholder action, court held that "minority fair market value discount" should not apply to shares of minority shareholder where there was no oppression by majority shareholder); *Pooley v. Mankato Iron & Metal, Inc.,* 513 *N.W.*2d 834, 837–38 (Minn.Ct.App.1994), *review denied,* 1994 Lexis 389 (Minn. May 17, 1994) (holding that court did not abuse its discretion in declining to reduce value of minority shareholder's share by minority discount in ordered buy-out of minority shareholders' shares pursuant to Minn.Stat. ¶ 302A,751, subd. 2 (1988)); *compare In re Seagroatt Floral Co.,* 78 *N.Y.*2d 439, 576 *N.Y.S.*2d 831, 583 *N.E.*2d 287, 291–92 (1991) (holding that application of marketability discount to value all shares of corporation was appropriate, but application of further minority discount was inappropriate) with *McCann Ranch, Inc. v. Quigley–McCann,* 276 *Mont.* 205, 915 *P.*2d 239, 242–43 (1996) (finding trial court did not err in applying minority discount of twenty-five percent in determining "fair value" of minority shareholder's shares, where court found plain-

tiff had not initiated court action as oppressed shareholder and parties had agreed to accept value of stock as determined by lower court that applied specific methodology recommended by plaintiff's own expert appraiser) and *McCauley v. Tom McCauley & Son, Inc.*, 104 *N.M.* 523, 724 *P.*2d 232, 243–44 (App.1986) (allowing twenty-five percent minority discount to shares of oppressed shareholder because he had noncontrolling interest in closely-held corporation); *see also Balsamides, supra,* 313 *N.J.Super.* at 27–29, 712 *A.*2d 673 (acknowledging split among courts deciding issue).

*N.J.S.A.* 14A:12–7(8)(a) governs court-ordered dissolution. That section specifically provides that the purchase price shall be a "fair value" "deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought" under *N.J.S.A.* 14A:12–7(1)(c) (the Oppressed Shareholder Statute). Thus, the statute gives courts "substantial discretion to adjust [the company's] purchase price" to reflect a marketability discount. 2 MacKay, *supra,* § 14–6(d)(2)(e). Particularly when court actions are filed on account of "oppression -as opposed to deadlock[,]" "[f]air value may be adjusted to the extent the court deems equitable." *Ibid.*

Accordingly, we find that courts in deciding whether to apply a marketability discount to determine the "fair value" of shares of a shareholder forced to sell his stock in a judicially ordered buy-out must take into account what is fair and equitable.

## C.

■ Plaintiffs claim that the Appellate Division's decision creates an "unjust sanction" for the owners of close corporations. By not applying a marketability discount, plaintiff argues, the remaining shareholder will have to absorb the full reduction for lack of marketability when he sells the company at a future date. The Appellate Division, conversely, thought it would be "neither 'fair' nor 'equitable' for the surviving shareholder to obtain the selling shareholder's interest at a discount." *Balsamides, supra,* 313 *N.J.Super.* at 29, 712 *A.*2d 673.

Central to the Appellate Division's and defendant's argument that no marketability discount should apply is the fact that the buyer does not have to be found from a pool of buyers, large or small. The buyer is found: it is Balsamides. Applying that theory, the Appellate Division dismissed the notion that Balsamides might sell all or part of the Company in the future:

> The problem with applying such a discount in this case is that there was no sale of Perle's stock to the general public nor was Balsamides buying an interest in the company, minority or otherwise, that might result in the later sale of a partial interest to a member of the public.

[*Id.* at 27, 712 A.2d 673.]

That is an erroneous assumption. The position of the Appellate Division ignores the reality that Balsamides is buying a company that will remain illiquid because it is not publicly traded and public information about it is not widely disseminated. Protameen will continue to have a small base of available purchasers. If it is resold in the future, Balsamides will receive a lower purchase price because of the company's closely-held nature.

If Perle and Balsamides sold Protameen together, the price they received would reflect Protameen's illiquidity. They would split the price and also share that detriment. Similarly, if Balsamides pays Perle a discounted price, Perle suffers half the lack-of-marketability markdown now; Balsamides suffers the other half when he eventually sells his closely-held business. Conversely, if Perle is not required to sell his shares at a price that reflects Protameen's lack of marketability, Balsamides will suffer the full effect of Protameen's lack of marketability at the time he sells. Accordingly, we find that Balsamides should not bear the brunt of Protameen's illiquidity merely because he is the designated buyer.

To secure a "fair value" for Perle's stock, a marketability discount should be applied. To do otherwise would be unfair, particularly since Perle was the oppressor and Balsamides was the oppressed shareholder. The fact that the buyer is known is irrelevant. When Balsamides eventually sells, he will suffer the full effect of any marketing difficulties. Because the "equities" of

this case quite clearly lie with Balsamides, it would be unfair to allow Perle to receive Protameen's undiscounted value.

We further observe that a thirty-five percent marketability discount, if properly applied, was appropriate in this case. The Appellate Division, although rejecting the use of the discount, commented that marketability discounts typically have ranged between thirty percent and forty percent. *Balsamides, supra,* 313 *N.J.Super.* at 27, 712 *A.*2d 673. One author cites a study documenting marketability discounts in the range of thirty percent to forty percent for closely-held companies. Harris, *supra,* 42 *Ark. L.Rev.* at 658–59; *see also* Hood, et al., *supra,* 65 *UMKC L.Rev.* at 439–40 (citing study concluding that "35% nonmarketability discount from intrinsic value is appropriate for stock in a closely-held corporation"). Accordingly, we find that a thirty-five percent marketability discount is within the generally accepted and reasonable range given the facts presented.

## D.

The question remains whether a marketability discount properly was applied below. Some commentators observe that a marketability discount is not a discount at all. Rather, it is a price adjustment reflecting factors typical of close corporations. Those factors include dependence on key employees or key customers, and go beyond the ready salability or liquidity of the firm. To adjust for those factors, an appraiser might use a higher capitalization rate or a lower multiple for earnings. John R. MacKay II, *A Pair of Important Holdings,* 153 *N.J.L.J.* 962, 963 (1998). As one commentator observes:

> Up until its most recent addition, the IRS Valuation Guide advised agents that the most effective way to counter taxpayer arguments for the marketability discount "is to indicate that you have taken it into consideration in your overall appraisal of the stock and for that reason you have applied a conservative capitalization rate or weighed certain of the other factors from a conservative standpoint to give effect to this marketability factor."
>
> [Harris, *supra,* 42 *Ark. L.Rev.* at 657–58].

Hoberman asserts that he did not factor a marketability discount into his choice of the thirty percent capitalization rate and examination of his testimony supports that conclusion. On direct examination, Hoberman explained how he valued Protameen using the "excess earnings" method. He testified that he arrived at a value of $4,170,000 *after* applying a thirty-five percent discount for lack of marketability. That amount represented "a value of the company based on one hundred percent of the stock."

The trial court then asked Hoberman specifically, "why isn't lack of marketability a factor in your analysis? Why didn't you factor that into your analysis?" Hoberman responded, "[We] didn't take it into consideration in building up our capitalization rate, and as I stated before, closely-held businesses don't have an active market to go out and sell their stock." Those statements suggest that Hoberman had not factored a marketability discount into his "excess earnings" valuation and that such discount was applied only once, at the corporate level.

Hoberman's cross-examination further supports the conclusion that he did not factor a marketability discount into the capitalization rate. Defense counsel asked Hoberman whether the figure of $6,425,230 "represented the value of one hundred percent of the shares of stock of the company[.]" He answered, "[Y]es, it does, before any marketability discounts." Defense counsel then proceeded to question Hoberman regarding the purpose of a marketability discount. Hoberman explained that the discount reflects the fact that there is no readily available market for Protameen's stock. Defense counsel pressed on: "isn't it correct that if you were to sell one hundred percent of the company that the marketability discount should not be taken into effect." Hoberman disagreed. He explained that "[a]ll nonpublic companies, regardless of the block, the size of the block of the stock offered, have no market on which to sell these stocks. Therefore, any company that does not have this availability of markets is going to suffer a marketability discount." Hoberman further explained that a marketability discount is not necessarily based on the size of the

company. It is reflective of the fact that the company is a closely-held "nonpublic business that [has] no market on which to sell [its stocks]." Moreover, he explained that whether you apply a marketability discount to one hundred percent of the shares of stock, fifty percent of the shares of stock, or twenty percent of shares of stock, the marketability discount would be the same.

Based on the record, we do not believe that Hoberman incorporated a marketability discount into his $6,425,230 initial valuation of the Company. Hoberman's appraisal focused on the historical performance and specific attributes and risks of Protameen. It was not based on the income or market approach.

Hoberman arrived at the capitalization rate based on six negative factors. We have remanded that issue to the trial court for further clarification. In reconsidering the thirty percent capitalization rate, the trial court, if it chooses, may reconsider whether Hoberman incorporated a thirty-five percent "marketability discount" in his "excess earnings" analysis. If he did, an additional marketability discount should not have been applied.

## V.

Although it would be helpful to pronounce a consistent rule regarding the determination of "fair value" and the applicability of discounts under various circumstances, we cannot do so. Each decision depends not only on the specific facts of the case, but also "should reflect the purpose served by the law in that context." 2 *ALI Principles,* comment e, to ¶ 7.22 at 312.

In both *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 407, 734 *A.*2d 738, and in this case, we have decided that the "equities of the case" must be considered when ascertaining "fair value" in appraisal and oppressed shareholder actions. In *Lawson Mardon Wheaton, supra,* 160 *N.J.* at 389, 734 *A.*2d 738, as in the present case, we know who is buying the shares. In *Lawson Mardon Wheaton,* it is the company; in this case, it is the oppressed shareholder. In both cases, the shareholder is entitled to the "fair

value," rather than "fair market value," of his shares. Application of the equities in the two cases, however, dictates opposite results.

In *Lawson Mardon Wheaton, supra*, 160 *N.J.* at 389, 734 *A.*2d 738, the corporation in an attempt to restrict future public sales of the company's stock approved a plan to restructure the corporation that triggered the rights of dissenting shareholders to demand payment of the "fair value" of their shares under the Appraisal Statute. In that case, we held that in calculating the "fair value" of the dissenters' shares, it would be unfair and inequitable to apply a marketability discount. To allow the majority shareholders to buy out the minority dissenters at a discount would penalize the minority for exercising their statutory rights. Moreover, it would create the wrong incentives for shareholders. It would tempt the majority to engage in activities designed to create dissent. It also would encourage the majority to expel troublesome shareholders while simultaneously allowing them to profit. Such a result runs contrary to the appraisal statute's design.

Of course, the possibility always remains that a group will fabricate disapproval of a corporate change in an effort to extract undiscounted value. The remaining shareholders would be left to shoulder the full burden of a lack of marketability. However, the majority would not remain unprotected. The majority must make a material structural corporate change to trigger appraisal rights. The dissenters cannot fabricate dissent on their own. In the event that shareholders manipulated corporate activity to gain unfair advantage, principles of equity would enable the court to determine fair value accordingly.

In cases where the oppressing shareholder instigates the problems, as in this case, fairness dictates that the oppressing shareholder should not benefit at the expense of the oppressed. Requiring Balsamides to pay an undiscounted price for Perle's stock penalizes Balsamides and rewards Perle. The statute does not allow the oppressor to harm his partner and the company and be rewarded with the right to buy out that partner at a discount. We

do not want to afford a shareholder any incentive to oppress other shareholders. What to do when it is the oppressing shareholder who is given the buy-out option is a harder question that we need not decide. The guiding principle we apply in this case and in *Lawson Mardon Wheaton* is that a marketability discount cannot be used unfairly by the controlling or oppressing shareholders to benefit themselves to the detriment of the minority or oppressed shareholders.

## VI.

The judgment of the Appellate Division is affirmed in part, reversed in part, and the matter remanded to the trial court for reconsideration of Hoberman's use of thirty percent capitalization rate in valuing Perle's interest in Protameen and for consideration of the issue of an award of counsel fees to plaintiffs.

*For affirmance in part; reversal in part; remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.