# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4892-16T4
      A-4893-16T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

  Plaintiff-Respondent,

v.

P.C.G.-H. and R.J.H.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF T.J.H.,

  a Minor.

_____

    Argued September 26, 2018 – Decided October 5, 2018

    Before Judges Alvarez and Mawla.

    On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0116-17.

    James D. O'Kelly, Designated Counsel, argued the cause for appellant P.C.G.-H. (Joseph E. Krakora,

Public Defender, attorney; James D. O'Kelly, on the briefs).

Anne E. Gowen, Designated Counsel, argued the cause for appellant R.J.H. (Joseph E. Krakora, Public Defender, attorney; Anne E. Gowen, on the briefs).

Monisha A. Kumar, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Monisha A. Kumar, on the brief).

James J. Gross, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; James J. Gross, on the brief).

PER CURIAM

Pamela (P.C.G.-H.) and Robert (R.J.H.) are the parents of Teresa (T.J.H.).[1]  In these consolidated appeals, both parents challenge a judgment, which terminated their parental rights and granted the Division of Child Protection and Permanency (Division) guardianship of Teresa.  We affirm.

I.

The following facts are taken from the record.  Pamela and Robert married in 2006.  Teresa was born in 2011, and is presently seven years old.

---

[1] We utilize fictitious names to protect the child and the parties' privacy.

The Division began its involvement with the family in July 2014, after it received a referral from the Clara Maass Hospital emergency room. Pamela had brought then three-year-old Teresa to the hospital to treat her asthma. While Teresa was receiving her nebulizer treatments, Pamela left her alone in the room and was discovered in the hospital lobby. Hospital staff reported Pamela was acting belligerently, arguing with workers, and causing a substantial disturbance. According to hospital staff, Pamela began changing her clothes in view of other hospital visitors.

When Division caseworkers arrived, they reported Pamela's erratic behavior and noted concerns for her mental health. Pamela revealed she had been diagnosed with bipolar disorder, suffered other mental impairments, and had ceased taking medication. When Division caseworkers transported the family back to their home, they observed it was unkempt and mandated a home inspection before Teresa could be returned to Pamela and Robert.

On behalf of the Division, Dr. Elizabeth Grossier conducted a psychological evaluation of Pamela. Dr. Grossier noted Pamela's substantial difficulty in maintaining focus and delivering clear and logical thoughts, as well as manic symptoms and mental confusion. Dr. Grossier found Pamela required mental health treatment and lacked the capacity to care for herself. She

A-4892-16T4

concluded Pamela could not act as sole caretaker for Teresa without presenting a significant risk of harm to the child.

Pursuant to Dr. Grossier's recommendation, Dr. Alexander Iofin performed a psychiatric evaluation of Pamela. Dr. Iofin concurred with Dr. Grossier's conclusion Pamela could not be Teresa's sole caretaker due to psychiatric and neuropsychiatric problems.

Relying on these evaluations, the Division implemented in-home health aide assistance four times per week to address Pamela's mental health issues and care for Teresa. Robert, who was certified as a home health aide, agreed to provide Pamela fourteen hours of additional assistance each week.

In January 2015, a health aide reported the family's home was without a functioning gas line, and thus lacked heat or a means to cook food. Eventually, because of disputes over habitability of the residence and payment of rent, the family was evicted. Both parents spent several months living between homes and at a YMCA. Ultimately, they came to live in the home of the father of one of Pamela's other children.

The Division began to receive reports Robert was experiencing health-related issues and may not be capable of caring for Teresa independently. In August 2015, the East Orange Police Department received multiple reports

Robert had appeared intoxicated, wandering the streets with Teresa. When police stopped Robert, he was unable to recall his address or telephone number. The officer determined Robert's symptoms were related to seizures, rather than intoxication.

Robert disclosed to the Division he suffered from epilepsy, seizures, memory loss, and had difficulties with speech. He also conceded he and Teresa were homeless and lacked a support system. Robert claimed he had not spoken to Pamela in two days and was unsure of her whereabouts. When the Division located Pamela, she claimed she had left Robert and Teresa to find a parking spot for her car, but was unable to locate them when she returned, and could not reach Robert. Pamela was unable to account for her whereabouts during the two days in question. The Division removed Teresa, and placed her in a resource home.

Pamela was reevaluated by Dr. Grossier and Dr. Iofin, who both reported her worsening condition due to her failure to participate in treatment services. Neither doctor found Pamela to be a viable parenting option for Teresa.

Robert failed to avail himself of the treatment services following Teresa's removal. He had no contact with the Division for two months, and when he re-emerged, claimed to have been hospitalized after hitting his head, but produced

no medical records to support this assertion. Eight months after Teresa's removal Robert completed a psychological evaluation. However, he failed to attend multiple neuropsychological assessments, and numerous other evaluations arranged by the Division.

As a result of failing to comply with services and their deteriorating condition, the Division changed Teresa's permanency goal from reunification to termination of parental rights followed by adoption, and filed a guardianship complaint.

Subsequent to the filing of the complaint, neither parent's compliance improved. Pamela was discharged from a mental health treatment program for failure to adhere to treatment recommendations. She then re-enrolled in the program three days before the permanency hearing, attended regularly for two months, and ceased attending altogether in February 2017. Robert also failed to comply with the Division's recommended services. He only briefly enrolled in a mental health treatment program and admitted using heroin. Both parents claimed to attend other services independently, but never provided proof of attendance to the Division or the court.

During the guardianship trial, the Division presented the testimony of Dr. Mark Singer, caseworker Peggy Wright, and the Division's adoption supervisor

Robinson Paul. Pamela testified on her own behalf. The law guardian and Robert did not present testimony.

Dr. Singer testified neither parent possessed the parental capacity to care for Teresa. He opined Pamela suffered from a substantial thought disturbance or HIV/AIDS-related dementia, which made her prone to delusional thoughts. He concluded Pamela's mental condition would deteriorate over time, especially in less structured "ambiguous" settings encountered by child rearing parents. Dr. Singer concluded Pamela would be unable to adapt to the evolving needs of a child.

Dr. Singer concluded Robert also struggled in ambiguous situations due to his difficulty with comprehension and impaired memory. Dr. Singer found Robert's inability, or unwillingness, to acknowledge Pamela's mental deficiencies prevented him from effectively compensating for them. He concluded neither party was a viable option to parent Teresa.

Dr. Singer also performed a bonding evaluation and concluded Teresa would experience a negative reaction if her relationship with her parents was terminated. He opined Teresa required permanency, namely, a stable figure capable of providing the care and guidance a child requires navigating uncertain life events. He testified neither parent could provide the stability and

7

responsiveness necessary to meet Teresa's need for permanency, because they were incapable of parenting and would continue to decompensate. He concluded Teresa's best interest would be served by select home adoption.

In its efforts to seek permanent placement options with relatives, the Division located and assessed Teresa's maternal aunt as a potential placement. However, she was ruled out due to inadequate living accommodations. The Division located Teresa's maternal uncle, however he withdrew from consideration citing medical concerns related to his wife. The Division assessed the father of another one of Pamela's other children who presented himself as a placement option for Teresa, either through adoption or kinship legal guardianship (KLG), but subsequently withdrew his application. K.G., Pamela's adult daughter who resided in Alabama, expressed an interest in adopting Teresa. However, her home ultimately failed the interstate licensing process.

Notwithstanding, Paul testified Teresa was a candidate for adoption. He stated the Division would place Teresa into the New Jersey Adoption Exchange, the National Adoption exchange, and enroll her in Division-organized social events to enable Teresa to interact with potential adoptive families.

On June 29, 2017, Judge Wayne J. Forrest issued a forty-eight-page written opinion terminating the parties' parental rights. The judge found the

Division had proven all four prongs of the best interest of the child test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.

Specifically, the judge found Pamela and Robert's chronic homelessness and long standing housing instability had endangered Teresa. The judge found Pamela's severe and worsening untreated mental condition continued to endanger Teresa. He found Robert's untreated medical conditions were the cause of Teresa's removal.

Under the second prong, the judge found the parties' failure to address their mental health and medical needs was proof they were unable or unwilling to remove the harm confronting Teresa. The judge concluded the parties' failure to ameliorate their condition would inevitably compound the harm she had already suffered.

As to the third prong, the judge found the Division had satisfied its obligation to offer services to each parent prior to seeking termination of their parental rights. The judge also found there were no viable options to termination of parental rights because KLG and other relative placements were considered, but had failed.

As to the fourth prong, the judge concluded Teresa's best interests would be served by termination of parental rights followed by adoption, and

termination would not do more harm than good. Specifically, the judge noted the importance of permanency to Teresa's healthy development and concluded the parties' inability to mitigate the circumstances, which led to the child's removal, left no possibility of permanency with them. The judge acknowledged severance of the parental relationship would cause some negative impact, but concluded neither Pamela nor Robert could provide the care and stability necessary to achieve permanency. The judge found granting the Division guardianship would allow it to seek a broad range of permanency options in adoption otherwise unavailable to Teresa.

The Division was granted guardianship of Teresa. This appeal followed.

## II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing N.J.

10

Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010); Balsamides v. Protameen Chems., 160 N.J. 352, 372 (1999)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare, 154 N.J. at 411-13).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they

relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

As codified, N.J.S.A. 30:4C-15.1(a) requires the Division prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

On appeal, Robert challenges the judge's findings on all four prongs and urges us to conduct de novo review. Regarding prongs one and two, Robert claims the judge's decision did not explain how his disabilities harmed Teresa or affected his ability to parent. As to prong three, he argues the Division failed to make reasonable efforts to assist him in managing his epilepsy or help either

12

parent find housing.  Robert asserts the judge's prong four finding was erroneous because his ability to parent, and the absence of an adoptive placement, demonstrated termination would do more harm than good.

Additionally, Robert argues Dr. Singer's report does not support the termination of parental rights and is a net opinion.  He also asserts Dr. Singer interpreted the psychological testing in a biased manner favoring the Division.  Robert asserts the questions the judge asked of the Division's expert at trial demonstrate the judge had ceded the fact-finding function to the expert.

Pamela challenges the judge's findings under prongs three and four.  As to prong three, she argues the Division failed to consider alternatives to termination of parental rights, namely that K.G. was willing to adopt Teresa.  Pamela also challenges the findings under prong four, and argues termination would do more harm than good because there was a pending interstate assessment to place Teresa with K.G.  Pamela argues the guardianship should have been dismissed and the matter returned to the FN docket rather than proceed to a guardianship trial.

After reviewing these arguments in light of the record and applicable legal principles, we are convinced they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  Judge Forrest's factual

13

findings are supported by the substantial credible evidence and his legal conclusions are unassailable in light of those findings. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). We only add the following relating to the parties' arguments under prong four.

Prong four requires the Division to show "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from permanent disruption of [their] relationship with [their] foster parents." I.S., 202 N.J. at 181 (quoting J.N.H., 172 N.J. at 478).

Pamela and Robert argue the evidence in the record was insufficient to support the judge's conclusion the termination of parental rights would not do more harm than good because Teresa maintained a strong relationship with her parents, the Division had not located a permanent adoptive home for her, and the Division's expert testimony confirmed Teresa would be harmed by severance of her parental relationships. Both parents rely upon E.P., 196 N.J. 88, 92-93 (2008), where the Supreme Court reversed a judgment terminating the parental rights of a mother to her thirteen-year-old daughter.

In E.P. the child was in her seventh foster home, and her prospects of adoption were "slim," "bleak," and "elusive." Id. at 109. The child's mother was the "one sustaining force in [her] life . . . ." Ibid. The child had an extreme and violent reaction to the prospect of adoption, and attempted to take her own life upon learning she would not be unified with her mother. Id. at 105.

The Court found the termination of parental rights did "not appear to have any real compensating benefit, particularly in light of the expert opinions rendered at the guardianship hearings that the 'window of attachment to somebody else is closing real fast.'" Id. at 109. The Court noted the child maintained an intense emotional bond to her mother, and the relationship must be weighed against the "slender prospect of adoption[.]" Id. at 110. The Court

15

concluded it was "highly questionable" the child "would ever find a home with a foster family." Ibid.

The E.P. Court noted a "decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for a more promising relationship [in] the child's future." Id. at 108 (citing Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610 (1986)). It found a termination under such circumstances may cause substantial harm to the child. Id. at 109. The Court stated although the Division's goal must be to achieve permanency, "the unlikely possibility of permanency in the future" should not outweigh "a strong and supportive relationship with a natural parent." Id. at 110-11.

The facts here are different. Teresa has not exhibited any of the same substantial behavioral concerns as the child in E.P. She has remained with the same resource parent, without incident, for the entirety of the two years she has been separated from Pamela and Robert. The resource parent remains committed to caring for Teresa until a permanent placement is located. Dr. Singer testified termination of parental rights followed by select home adoption was in the Teresa's best interest, and a delay in permanency would cause greater harm to her than would severance of the parental relationship. Additionally, the

Division presented unrebutted testimony it expected no difficulty in finding a permanent adoptive placement for Teresa once she was freed for adoption.

Pamela also relies on N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228 (App. Div. 2010). There, the trial court had terminated the parental rights of a mother and father. Id. at 232. On appeal, we reversed because a significant change in circumstances had occurred since the entry of the guardianship judgment, namely, the mother had "continue[d] her sobriety, [was] fully compliant with parole, remain[ed] employed and sustain[ed] adequate housing." Ibid.

T.S. is inapposite. The circumstances here have not changed for the better, to warrant reversal of guardianship judgment. The facts support Judge Forrest's conclusion "[Teresa] will receive the permanency and stability she deserves upon termination of the parental rights . . . and being made legally free for adoption."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4892-16T4