753 A.2d 1205 (2000)
332 N.J. Super. 499
CAP CITY PRODUCTS CO., INC., a New Jersey Corporation, and Joseph Conte, Plaintiffs-Appellants,
v.
Valentin LOURIERO, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 2000.
Decided July 5, 2000.
*1206 Lisa S. Bonsall, Newark, for plaintiff-appellant (McCarter & English, attorneys; Ms. Bonsall and Michael R. Von Ohlen, on the brief).
Thomas P. Monahan, Jr., Hackensack, for defendant-respondent (Winne, Banta, Rizzi, Hetherington & Basralian, attorneys; Mr. Monahan and Brian J. Neff, on the brief).
Before Judges MUIR, Jr., WALLACE, Jr., and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
When defendant Valentin Louriero, the president and one of the two shareholders of Cap City Products Co., Inc. (Cap City) decided to retire, he and the other shareholder, plaintiff Joseph Conte, agreed that Conte would purchase all of Louriero's Cap City stock. They also agreed on how they would determine the purchase price for that stock. If they could not otherwise reach an agreement, they would "mutually select a third party to value the stock and to arbitrate a binding settlement." They were unable to reach agreement, and thus they did appoint such a "third party," Gary Trugman, who then provided an evaluation of the stock which included a twenty-five per cent "marketability discount."
Louriero disagreed with Trugman's valuation and, in order to enforce the parties' agreement and Trugman's valuation, Conte instituted suit in the Chancery Division. There, on cross-motions for summary judgment, the court treated the matter as an application to enforce an arbitration award, concluded that Trugman had committed "an error as to law" by employing a marketability discount, and altered Trugman's award by deleting the discount and thus awarding Louriero a higher price for his stock.[1]
We are satisfied that, whether Trugman's determination be termed an arbitration award or the product of a settlement, the trial court erred by setting aside the determination because of an alleged "error as to law." Accordingly, we reverse and remand the matter for entry of judgment in favor of Conte, based on Trugman's valuation of the stock.
The facts can be briefly stated. For several years, Conte and Louriero were the sole stockholders and officers of Cap City. Louriero owned approximately twenty percent of the corporation's stock and served as President. Conte owned the remaining eighty percent.
In the summer of 1994, Louriero advised Conte that he wanted to retire effective December 31, 1995. He and Conte then entered into negotiations which produced an oral agreement under which Conte would buy all of Louriero's Cap City stock. The parties agreed that Louriero's interest would be valued as of December 31, 1994, *1207 and they also agreed on a procedure for determining the value to be paid by Conte. Louriero memorialized the parties' agreement by a writing he prepared, dated October 10, 1994. As it concerns the issue before us, the provision read in its entirety as follows:
3) We (J. Conte and I) agree to have separate valuations done to determine Cap City's fair market value. If the valuations are within 10% of each other (my figure) then we will negotiate a compromise.
4) If the valuations are far apart, then we will mutually select a third party to value the stock and to arbitrate a binding settlement.
Conte and Louriero did each select someone to value the stock, but the values reached by those two were not "within ten percent of each other." Then, pursuant to their agreement, the parties selected Gary Trugman of Trugman Valuation Associates to perform the required valuation of Louriero's interest in Cap City as of December 31, 1994.
Trugman produced a report dated November 22, 1995, in which he assessed Louriero's interest at $257,000, a figure he obtained after applying a twenty-five percent "discount for lack of marketability." Upon receipt thereof, Conte offered to pay Louriero the $257,000 for his stock.
Louriero, however, objected to Trugman's report, and specifically, to application of a marketability discount. Based on those objections, Trugman made some changes in his report and concluded in a follow-up letter, that "a reasonable revision to our initial report," based on Louriero's additional comments, would increase the value of Louriero's stock to $300,000. That number, however, still included the twenty-five percent marketability discount which Trugman continued to maintain was appropriate in valuing Louriero's stock. Indeed, Trugman contended that the twenty-five percent discount was relatively small and a larger percentage might well have been appropriate. We note also that plaintiff claims (and defendant does not deny) that the earlier evaluators selected independently by the two parties had also employed a marketability discount which was twenty-five percent or more.
Louriero continued to reject Trugman's report and refused to accept his $300,000 valuation. Ultimately, plaintiff filed suit in the Chancery Division seeking enforcement of the parties' agreement. The trial court then decided the matter on cross-motions for summary judgment, concluding that Trugman had erred in employing the twenty-five percent discount and concluding that $400,000, rather than $300,000, was the amount Conte must pay for Louriero's stock.

I
The Chancery Division treated the matter as one seeking enforcement of an arbitration award. We agree with that characterization. However, in reviewing Trugman's award, the court employed a standard which it found in a 1981 decision of this court, Selected Risks Ins. Co. v. Allstate Ins. Co., 179 N.J.Super. 444, 451, 432 A.2d 544 (App.Div.1981), rather than that set out in the controlling opinion of the Supreme Court in Tretina Printing, Inc. v. Fitzpatrick & Assoc., Inc. 135 N.J. 349, 640 A.2d 788 (1994).
In Tretina, the Court discussed the previously existing standard under which a court could vacate an arbitration award. That standard included the power to take such action whenever an arbitrator's award "embraced egregious mistakes of law." Tretina, supra, 135 N.J. at 356, 640 A.2d 788. The Court noted that the "egregious mistake of law" standard had been approved in its most recent previous treatment of the issue, in Perini v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 610 A.2d 364 (1992). However, said the Court, a plurality of its members had now become convinced that the proper standard was that which had been set out in the concurring opinion of Chief Justice Wilentz in *1208 Perini, which rejected the concept of setting aside an arbitration award because of a mistake in law. With approval, the Court quoted and adopted the standard and reasoning articulated by the Chief Justice in Perini:
Basically, arbitration awards may be vacated only for fraud, corruption, or similar wrongdoing on the part of the arbitrators. [They] can be corrected or modified only for very specifically defined mistakes as set forth in [N.J.S.A. 2A:24-9]. If the arbitrators decide a matter not even submitted to them, that matter can be excluded from the award. For those who think the parties are entitled to a greater share of justice, and that such justice exists only in the care of the court, I would hold that the parties are free to expand the scope of judicial review by providing for such expansion in their contract; that they may, for example, specifically provide that the arbitrators shall render their decision only in conformance with New Jersey law, and that such awards may be reversed either for mere errors of New Jersey law, substantial errors, or gross errors of New Jersey law and define therein what they meant by that. I doubt if many will. And if they do, they should abandon arbitration and go directly to the law courts.
[Tretina, supra, 135 N.J. at 358, 640 A.2d 788, quoting Perini, supra, 129 N.J. at 548-49, 610 A.2d 364.]
Thus, even assuming Trugman made a mistake of law by using a marketability discount, that assumed mistake would provide no basis to overturn or modify his award, There is no claim of "fraud, corruption, or similar wrongdoing," nor was there any provision in the parties' agreement (as confirmed by Louriero's writing) which specifically provided that Trugman should render his decision "only in conformance with the New Jersey law." There was, at most, a possible mistake of law and under the clear standard adopted in Tretina, such a mistake provides no basis for the relief which the Chancery Division awarded here.
Indeed, even under the holding of Selected Risks Insurance Co. v. Allstate Insurance Co., supra, the case that set out the since-rejected pre-Tretina rule, the court made clear that an arbitrator's award must be affirmed if the legal proposition at issue was "debatable." Similarly, in Perini, the court referred to setting aside an arbitration decision only for a legal error that was "gross, unmistakable, undebatable, or in manifest disregard of the applicable law and leading to an unjust result." Perini, supra, 129 N.J. at 496, 610 A.2d 364. Here, while one might debate the legal correctness of Trugman's use of a lack of marketability discount, there is no basis on which that decision could fairly be termed a gross error, an unmistakable error, or an undebatable error, nor could it be described as a decision made in "manifest disregard of the applicable law and leading to an unjust result." Ibid. It was, at the very least, a "reasonably debatable" proposition. Selected Risks Ins. Co., supra, 179 N.J.Super. at 451, 432 A.2d 544. Indeed, the closeness of the question represents a graphic illustration of the wisdom of the Tretina conclusion, to avoid the litigation which must ensue if a question such as that presented here is to be resolved anew by the courts after it has been decided by an arbitrator.
In two recent decisions, the Supreme Court dealt with the issue of a marketability discount in valuing the stock of a closed corporation. See, Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 734 A.2d 721 (1999) and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 734 A.2d 738 (1999).[2] The holdings in those *1209 cases make clear that the propriety or impropriety of a marketability discount in any given appraisal case cannot be resolved by a simple "yes" or "no" answer. Use of such a discount depends on the equities of the case and the purpose for which the appraisal is being performed.
Thus, in Balsamides, the appraisal was to determine the price which defendant Perle (the oppressor in a shareholder oppression case) was to receive from plaintiff Balsamides, the victim of that oppression, who was to purchase all of Perle's stock pursuant to a court order. The court discussed the theory of a marketability discount, noting that such a discount reflected the absence of a ready, available market for sale of the stock of a closely held corporation. The court reasoned that if Balsamides, who was to become the owner of all of the corporate stock, should subsequently attempt to sell the stock, he would inevitably be adversely affected by the limited market for such a closely held corporation. Thus, the price he would receive could be expected to reflect such a "discount" because of that lack of marketability. On that premise, it was fair and equitable that when Balsamides bought Perle's stock, the price should also reflect the marketability discount. To do otherwise, would provide an unwarranted bonus for Perlea particularly undesirable result because Perle had been guilty of oppressing Balsamides. Thus, the court found that application of a marketability discount (thirty-five percent in that case) was appropriate in determining "fair value" of Perle's stock and was "equitable" under the circumstances of the case.
On the other hand, in Lawson the court dealt with an appraisal to value stock being purchased by the corporation, under N.J.S.A. 14A:11-9(2), from shareholders who dissented from a proposed corporate reorganization. In determining whether to apply a marketability discount, the court noted that the applicable statute should be liberally construed in favor of the dissenting, selling stockholders; that there was a disparity between the views of commentators and other courts on the propriety of employing such a discount on a stock purchase from dissenting shareholders; and that the equities argued in favor of non-application of the discount. The court ultimately concluded that,
Marketability discounts should not be applied in determining the "fair value of a dissenting shareholder's share in an appraisal action...." A rule that imposes a discount on the exiting dissenting shareholder "fails to accord to a minority shareholder the full proportionate value of his shares ... [and] enriches the majority shareholder who may reap a windfall from the appraisal process by cashing out a dissenting shareholder...."
[Lawson, supra, 160 N.J. at 402, 734 A.2d 738 (citation omitted.)]
Thus, the court held, in a statutory appraisal to value the shares of dissenting stockholders, a marketability discount should be employed only if justified by "extraordinary circumstances," which the court did not find in the case before it.
In sum, there is no' simple answer to the question of whether a marketability discount should be employed when valuing stock in a closed corporation. The answer depends in part upon the purpose for which the stock is being appraised. It also depends on the policy underlying any applicable statute, and the "equities" of the case, which may include the identification of one party as an oppressor and another as an oppressed victim, or one as a dissenting stockholder subject to being "squeezed-out" by a dominant majority.
The question of whether Trugman's use of a marketability discount constituted an error of law is, therefore, anything but clear. The parties here were dealing neither with a remedy against stockholder oppression or with the rights of a shareholder dissenting from a corporate recapitalization. Rather, they were dealing with a voluntary retirement, with one stockholder buying out the other pursuant to an *1210 agreement reached by the parties themselves.
It is not necessary for us to determine whether a marketability discount should or should not have been employed by Trugman. We note only that the issue is debatable. Under both the Tretina and the pre-Tretina rule, Trugman's determination to employ a marketability discount should not have been overruled by the trial court.

II
Louriero argues that the Tretina rule does not apply here, first because Trugman was not performing an arbitration, but rather an appraisal, and also because (Louriero argues) even if Trugman's function be deemed an arbitration, it was a common law arbitration and not one held pursuant to statute. We find the asserted distinctions unpersuasive, and we are satisfied that the Tretina principle applies regardless of the characterization used to describe Trugman's function.
Tretina does not represent a narrow holding applicable only to a specific case before the Supreme Court. Rather, it lays out a broad, strong policy, based on the concurring opinion presented by Chief Justice Wilentz in Perini, which bore fruit two years later when it was adopted in Tretina. The principle is set out above and its articulation can hardly be improved upon here. To the extent that statements in prior cases such as Elberon Bathing Co. v. Ambassador Insurance Co., 77 N.J. 1, 17, 389 A.2d 439 (1978), Levine v. Wiss & Co., 97 N.J. 242, 248, 478 A.2d 397 (1984) or Lakewood Township Municipal Utilities Authority v. South Lakewood Water Co., 129 N.J.Super. 462, 471, 324 A.2d 78 (App.Div.1974), suggest a different principle, or reach a different conclusion because the independent party performing the decision-making function is termed something other than an arbitrator, those cases must be deemed modified by the subsequent holding in Tretina.
Further, the binding nature of the parties' agreement here rests also on a firmly settled, strong principle of New Jersey law apart from the Tretina doctrine. Our courts have said, time and again, that settlements are favored and will be enforced whenever voluntarily agreed to by the parties. See, e.g., In re Public Serv. Elec. & Gas Co., 304 N.J.Super. 247, 266, 699 A.2d 1224 (App.Div.), certif. denied, 152 N.J. 12, 702 A.2d 351 (1997); Pascarella v. Bruck, 190 N.J.Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983).
Here, whatever label may be applied to the agreement between Louriero and Conte, it is clear that the two agreed to be bound by the valuation performed by Trugman. The trial court found that as a fact, and the language prepared and employed by Louriero himself leaves no doubt on that issue. As he himself set out the proposition, "we will mutually select a third party to value the stock and to arbitrate a binding settlement."
Louriero suggests that we interpolate into that statement an implied contingency that the valuation by the "third party" will represent a "binding settlement" only if it is consistent with some later determination as to governing New Jersey law. For the same reasons articulated in Tretina, we reject that argument. The agreement means precisely what it says: the parties agreed to "select a third party" who was to value Louriero's stock and "arbitrate a binding settlement." That is what Trugman did and there is no basis for this court or the Chancery Division to do anything other than enforce that determination.
The decision on appeal is reversed, and the matter is remanded for entry of an appropriate order consistent with this opinion.
NOTES
[1] As defined by the Supreme Court in Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 398-99, 734 A.2d 738 (1999), a "marketability discount" relating to the value of stock in a closely-held corporation, "adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation." The marketability discount is distinct from a so-called "minority discount" which "adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions." Ibid. We are concerned here with a marketability discount; not a minority discount.
[2] The Chancery Division decision here was rendered before the Supreme Court decisions in both Balsamides and Lawson, although it came after the Appellate Division decisions in both those cases. See Balsamides v. Perle, 313 N.J.Super. 7, 712 A.2d 673 (App.Div.1998) and Lawson Mardon Wheaton Inc. v. Smith, 315 N.J.Super. 32, 716 A.2d 550 (App.Div.1998).