**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1416-24

FISK HOLDINGS, INC.,
f/k/a FISK ALLOY, INC.,

     Plaintiff-Appellant,

v.

JANET M. GREEN,

     Defendant-Respondent.

_____

Argued September 30, 2025 – Decided December 3, 2025

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0242-21.

Jeremy Heep (Troutman Pepper Locke LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellant (Troutman Pepper Locke LLP and Jeremy Heep, attorneys; Angelo A. Stio, III, James Rosener and Stephanie L. Jonaitis, Jeremy Heep and Christopher R. Healy (Troutman Pepper Locke LLP) of the D.C., Pennsylvania and Virginia bars, admitted pro hac vice, on the briefs).

Nancy Erika Smith argued the cause for respondent (Smith Mullin, PC, attorneys; Nancy Erika Smith, of counsel and on the brief; Jesse D. Sengstacke, on the brief).

PER CURIAM

Plaintiff Fisk Holdings, Inc., f/k/a Fisk Alloy, Inc. (Fisk Alloy), appeals from the December 3, 2024 Law Division order confirming an arbitration award and entering final judgment in favor of its former employee, defendant Janet Green. We affirm in part and reverse in part.

## I.

We glean these facts from the record. Plaintiff Fisk Alloy is "a closely held corporation" that "manufactures high-quality copper alloy wire for use in" various industries. Eric Fisk is the President, Chief Executive Officer (CEO), and sole Director of Fisk Alloy. Fisk Alloy entered into an employment agreement (the Agreement) with Green on April 1, 2010. The Agreement provided Fisk Alloy would employ Green as its Chief Financial Officer from April 1, 2010, through December 31, 2020. Although subsequent changes were made to the Agreement during its ten-year term,[1] the Agreement was not

---

[1] The Agreement was amended on February 15, 2011, October 10, 2018, and December 20, 2019, to reflect, among other things, Green's new responsibilities and changes in compensation.

renewed or extended, despite the Agreement providing the parties with an option to do so.

Green's compensation package under the Agreement encompassed an annual salary. Along with an annual salary, Section 5.2 of the Agreement granted Green "[e]leven and [e]leven [o]ne [h]undredths (11.11) fully vested 'Stock Appreciation Rights' [(SARs)]."[2] The Agreement defined SARs as "the right to receive, in cash, the appreciation in value of one (1) share of Common Stock." To calculate the amount Green would receive, three factors were used: (1) the Current Market Price; (2) the Strike Price; and (3) the Trigger Date. The Current Market Price would be the price of Fisk Alloy's stock as of the Trigger Date. Pertinent here, the Trigger Date would be the date of Green's termination from Fisk Alloy. The Strike Price is a fixed dollar amount that represents the base value that must be subtracted from the Current Market Price.[3] Put simply, Green would be entitled to the right to receive a cash payment equal to the

---

[2] Created by contract, SARs involve "the right to receive the appreciation on a specified number of shares of [a] company's securities (generally common stock) which occurs within a specified period of time." Harold S. Bloomenthal & Samuel Wolff, Securities and Federal Corporate Law § 21:42 (2d ed. 2025).

[3] In the Agreement, the parties agreed that the Strike Price would be $85,058.50 for each SAR. Thus, for Green to be entitled to an appreciation payment, the Current Market Price of each share must exceed $85,058.50.

A-1416-24

increase in value of the Current Market Price over the Strike Price as calculated on the Trigger Date. The excess amount, called the "Spread," is multiplied by the number of SARs to calculate Green's appreciation payment.

The Agreement provided two methods for calculating the Current Market Price, depending on whether Fisk Alloy remained a private corporation or became a publicly traded company as of the Trigger Date. Because Fisk Alloy remained a private company during the pertinent period, the relevant procedure for determining the value of Fisk Alloy's Common Stock to calculate the Current Market Price was as follows:

> [T]he price equal to the amount which the holder of one (1) share of Common Stock would receive, on a fully diluted basis in accordance with generally accepted accounting principles[] if all assets and liabilities of the [c]ompany were sold for the "Appraised Value" . . . .
>
> For purposes of this Agreement, "Appraised Value" means the fair market value of the [c]ompany on a going concern basis, as determined by a written appraisal . . . prepared by an appraiser that is acceptable to the [c]ompany and Green. "Fair market value" is defined . . . as the price in a single transaction . . . that would be agreed upon by [a] . . . hypothetical buyer for a 100% interest in the equity capital of the [c]ompany.

The Agreement also specified the process by which the parties would select an appraiser to conduct an appraisal:

4

If the [c]ompany and Green cannot in good faith agree upon an appraiser, then the [c]ompany, on the one hand, and Green, on the other hand, shall each select an appraiser, the two appraisers so selected shall select a third appraiser who shall be directed to prepare such [a]ppraisal and the term "Appraised Value" shall mean the appraised value set forth in the [a]ppraisal prepared in accordance with this definition. The [c]ompany shall pay for the cost of any such [a]ppraisal.

Section 5.2(c) of the Agreement governed the payment schedule Fisk Alloy was required to follow if Green was entitled to an appreciation payment and a "Gross-Up Amount," essentially defined as an additional payment to Green so that—after she pays taxes (including taxes on the Gross-Up Amount itself)—she receives the same net amount she would have received if the appreciation payment was taxed at the more favorable long-term capital gains rate.[4] Under Section 5.2(c)(i), Green was to receive "[a]n amount equal to one-third of the [a]ppreciation [p]ayment, plus the full Gross-Up Amount" within seventy-five days after the Trigger Date as an "[i]nitial [p]ayment." The

_____

[4] Specifically, Section 5.2(b) of the Agreement defines Gross-Up Amount as "an amount such that, after payment of all . . . taxes . . . Green [would] receive an after-tax amount equal to the amount she would have received if all payments with respect to her [SARs] were taxed at the rates applicable to long-term capital gains."

5

"remaining unpaid [a]ppreciation [p]ayment" was to be paid "by a promissory note to be delivered to Green concurrently with the [i]nitial [p]ayment."

According to Section 5.2(c)(ii) of the Agreement,

> [The promissory] note shall provide for all outstanding principal, together with interest accruing at the applicable midterm federal rate as of the date of the [i]nitial [p]ayment, in twenty[-]eight equal quarterly installments due on . . . the first day of each calendar quarter through the seventh anniversary date . . . of the [i]nitial [p]ayment . . . beginning with the first calendar quarter after the [i]nitial [p]ayment. . . . The [n]ote will be secured by a pledge of [Eric Fisk's] shares in the [c]ompany. . . .

Section 5.2(h) of the Agreement provided a payment deferral clause stating: "In the event there is a bona fide dispute as to the entitlement to a payment under . . . Section 5.2 or the amount thereof, the due date of such payment shall be delayed for a reasonable time to resolve such dispute."

As to any future disputes, Section 12.1 of the Agreement contained an arbitration clause, providing in pertinent part:

> The parties agree that any controversy, claim[,] or dispute arising out of or in any way relating to this Agreement, Green's employment by the [c]ompany, or the ending of such employment, including, without limitation, any claim arising under this Agreement, . . . any claim for breach of any contract, express or implied, breach of the covenant of good faith and fair dealing, . . . negligent or intentional interference with contract or prospective economic advantage, . . . and

6

any claim for wages or other benefits that the [c]ompany may have against Green or that Green may have against the [c]ompany, or any of their past or present partners, directors, officers, associates, employees, consultants[,] or agents, shall be settled by final and binding arbitration.[5]

Under the Agreement, arbitration was governed by the Employment Arbitration Rules & Procedures of Judicial Arbitration and Mediation Service (JAMS).[6] Further, "[a] judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction" and "[e]ither Green or the [c]ompany may bring an action in any court of competent jurisdiction, if necessary, to compel arbitration under this provision, to obtain preliminary relief in support of claims to be prosecuted in arbitration, or to enforce an arbitration award."

As contemplated in the Agreement, Green's employment terminated on December 31, 2020. Believing Fisk Alloy intentionally depressed the value of the company to lower the calculation of her SARs, on January 13, 2021, Green

---

[5] Excluded from arbitration were "claims brought in a court of competent jurisdiction by either [party] to compel arbitration . . . , to enforce an arbitration award[,] or to obtain preliminary injunctive and/or other equitable relief in support of claims to be prosecuted in an arbitration by either party."

[6] JAMS Rule 11(b) provides: "Unless the relevant law requires otherwise, the [a]rbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

A-1416-24

filed a demand for arbitration with JAMS, demanding arbitration of the following disputes: (1) "Whether [Fisk Alloy] committed fraud and violated the covenant of good faith and fair dealing by reducing the value of . . . Green's [SARs] the day before its value would be calculated by canceling a bank agreement and providing dividends of $12.5 million to [its President] and his son"; (2) "Whether [Fisk Alloy] committed fraud and violated the covenant of good faith and fair dealing by manipulating the company's growth rates . . . to devalue . . . Green's [SARs]"; (3) "Whether [Fisk Alloy] overstated the impact of [COVID-19] on its normalized earnings and the earnings reflected in its [five-year] plan . . . to devalue . . . Green's [SARs] in violation of the covenant of good faith and fair dealing"; (4) "Whether . . . Green's contract and the covenant of good faith and fair dealing require both parties to participate in the selection of and discussions with a neutral appraiser of . . . Green's [SARs]"; (5) "Whether . . . Green['s] contract and the covenant of good faith and fair dealing require that the neutral appraiser has access to all relevant information and uses a fair, agreed-upon methodology to evaluate . . . Green's [SARs]"; and (6) "Whether [Fisk Alloy] must provide . . . Green with the [three m]illion [dollar] life insurance policy for conversion as promised by Eric Fisk."

In response, on January 19, 2021, Fisk Alloy filed a verified complaint and application for an order to show cause, seeking "[a] declaration that the determination of Appraised Value required under Section 5.2(a)(ii) must be performed before . . . Green can proceed with any [a]rbitration that asserts claims about or [are] predicated upon the Appraised Value of the company." The complaint specifically sought to "enjoin[]" Green from pursuing arbitration "until the appraisal process . . . [was] completed." Green cross-moved to stay the litigation and compel arbitration. In a March 5, 2021 oral decision, the motion judge denied Fisk Alloy's application for injunctive relief, granted Green's cross-motion, and referred the case to arbitration.

A seven-day arbitration hearing was conducted between September 28 and October 18, 2022. On February 21, 2023, the arbitrator issued a final award in Green's favor, finding that Fisk Alloy had acted in bad faith and violated the Agreement. Specifically, the arbitrator ruled that Fisk Alloy

> violated its duty of good faith and fair dealing: (i) by allowing [Fisk Alloy's] major shareholder, Eric Fisk, to withdraw . . . $12.5 million as a cash dividend just before the December 31 Trigger Date; and (ii) by intending that a five[-]year set of projections be the basis for the SARs valuation, but, at the same time, excluding [Green] from a meaningful role in the preparation of this plan, and by refusing to correct various assumptions in the plan when circumstances in December 2020, and at the very beginning of 2021,

demonstrated that these assumptions were either inaccurate or too conservative, and that a more optimistic outlook (than reflected in the [f]ive-[y]ear [p]lan) was warranted.[7]

The arbitrator denied any claims based on fraud and dismissed as not arbitrable all claims pertaining to the selection of the neutral appraiser or the appraisal process. The arbitrator expressly recognized that his authority did not encompass "conduct[ing] the actual valuation of the SARs," but only adjudicating and remedying the breach of duty and fraud claims. The arbitrator directed that the final award be provided by the parties to the chosen appraiser and required the parties to advise the appraiser that he or she "should (i) deem that there was . . . $12.5 million more in cash in the company than reflected on the balance sheet as of the Trigger Date, and (ii) consider this amount to be an asset of the company as of the Trigger Date."

Further, the arbitrator

> require[d] that the [p]arties not give the [f]ive-[y]ear [p]lan to the [a]ppraiser . . . unless both [p]arties agree that it has been properly updated to reflect all information, known or knowable prior to January 31,

---

[7] Green had claimed that Fisk Alloy "prepar[ed] in . . . 2020 a 'five-year plan' . . . that significantly, and intentionally, undervalued the financial outlook of [Fisk Alloy]," intending "to use this inaccurate and overly conservative set of projections as the basis for the valuation of [Green's] SARs" and excluding Green "from any meaningful role in the preparation of the [f]ive-[y]ear [p]lan."

A-1416-24

2021, that reflects on the financial status of the company and its financial prospects as of the Trigger Date.

The arbitrator also directed "that neither [p]arty be precluded from presenting to the [a]ppraiser . . . whatever evidence she or it believes to be relevant to the determination of the value of [Green's] SARs as of the Trigger Date." In addition, the arbitrator directed the parties to promptly appoint an appraiser, and directed Fisk Alloy to

> pay [Green] whatever is owed to her, as per Section 5.2(c) and (e) of the Agreement . . . with the first such payment to be made promptly after the result is rendered in the [a]ppraisal process, along with interest at the rate specified in Section 5.2(c)(ii) of the Agreement on that amount, with that interest accruing from what would have been the date of payment under Section 5.2(c) and (e) of the Agreement had this [a]rbitration proceeding not been brought until the date of the first payment.

On March 17, 2023, the judge granted Green's ensuing motion to confirm the arbitration award. On May 16, 2023, the judge entered a consent order amending the March 17, 2023 order. The May 16 order reaffirmed confirmation of the arbitration award and directed the parties to "follow the procedures outlined in Section [5.2(a)] of . . . [the Agreement] and the [a]rbitration [a]ward for purposes of valuing Green's [SARs]."

11

In accordance with the May 16 order, the parties each provided their choice of an appraiser, who mutually selected a neutral appraiser, Jeff Tarbell of Houlihan Lokey Financial Advisors, Inc. (Houlihan Lokey). On May 5, 2023, the parties retained Houlihan Lokey to conduct the appraisal. Consistent with the arbitration award, both parties directed Houlihan Lokey to calculate the value of Fisk Alloy as of December 31, 2020, but also "to take into account certain information that was known or knowable as of January 31, 2021."

In preparing the appraisal, Houlihan Lokey, among other things, reviewed various documents, including Fisk Alloy's bylaws, certificate of incorporation, and audited financial statements; toured Fisk Alloy's headquarters and manufacturing facility; met with the parties and their representatives; and reviewed and compared various data. The parties also provided Houlihan Lokey with all "requested information and any additional written information a party wanted to share." Prior to the release of the final appraisal, Houlihan Lokey sent both parties a "draft appraisal report" on August 31, 2023, seeking comments and feedback by September 6, 2023, which was subsequently extended at Fisk Alloy's request to September 7, 2023.

Houlihan Lokey issued the final appraisal on September 12, 2023. In the appraisal, Houlihan Lokey determined that "as of the [v]aluation [d]ate, the fair

12

market value of [Fisk Alloy] can be reasonably stated in the amount of $95.0 million, on a controlling ownership interest basis."  Houlihan Lokey calculated the SARs liability at $12,909,000.00, including the Gross-Up Amount.

Subsequently, Green moved to confirm the final arbitration award and obtain final judgment based on the appraisal.  In a supporting certification, Green's counsel averred that Houlihan Lokey's final appraisal determined that Green was "due $12,909,000.00," which "include[d] the appreciation amount of $9,842,000.00 plus the tax gross up of $3,067,000.00."  Counsel certified "[t]he first payment of one-third of the [SARs] appreciation [was] due 'promptly' according to the [a]rbitration [a]ward plus the full gross-up for tax," consistent with the Agreement.

According to counsel, "Green [was] also entitled to interest calculated at the mid-term interest rate at the time of the initial payment."  Based on the "the mid-term interest rate" for "September 2023" being "4.13%," counsel calculated "the first payment due total[ed] $7,799,220.00."  Counsel attached a promissory note to be executed by Eric Fisk for the remaining payments in accordance with the Agreement and the arbitration award, as well as a stock pledge agreement securing the amount due Green by a pledge of Eric Fisk's shares in the company.

A-1416-24

Fisk Alloy opposed Green's motion and cross-moved to compel arbitration. Fisk Alloy disputed several aspects of the appraisal, alleging Houlihan Lokey made serious errors, relied on faulty information, and exceeded its authority in conducting the appraisal. Fisk Alloy asserted that under Section 12.1 of the Agreement governing arbitration, the disputes regarding the appraisal were subject to arbitration.

On March 19, 2024, the judge heard argument on the motions. Green argued the appraisal was itself "an arbitration decision" and urged confirmation of the award in the interest of "finality." Fisk Alloy countered that an arbitrator, rather than the court, had to decide whether the appraisal dispute was "arbitrable."

The judge agreed with Green. The judge was "firmly of the opinion that the arbitration that was envisioned by the [A]greement ha[d] already taken place," and determined the appraisal was the "implementation of the arbitration award." According to the judge, "[t]he arbitrator ruled in [Green's] favor in finding that Fisk [Alloy] tried to cheat her out of what she [was] due" and "[t]he arbitrator ruled that the appraisal shall be final and binding so that . . . Green can be paid promptly." As such, the judge concluded the appraisal was not subject to additional arbitration.

The second issue the judge was asked to resolve concerned the interest rate to be applied to the promissory note for the remaining two-thirds of the appreciation payment. Fisk Alloy argued the applicable interest rate was 0.62%, representing "the applicable mid-term [f]ederal rate as of the date of the initial payment" which "would have been March 15, 2021." On the other hand, "Green used the mid-term [f]ederal rate of 4.13[%] that was in effect as of September 15, 2023." The judge allowed the parties additional time to brief the issue.

On December 3, 2024, after hearing argument, the judge determined the applicable interest rate was 4.13%, not 0.62% as Fisk Alloy advocated. The judge explained, "looking at the totality of the circumstances . . . and what Fisk [Alloy] has done, this [c]ourt is satisfied that the applicable mid-term federal rate is the rate that should apply, which . . . is [4.13] percent, and to rule that Fisk [Alloy] is entitled to pay interest at a rate sub one percent would be . . . a fundamental miscarriage of justice." Thus, the judge granted Green's motion to confirm the final arbitration award and entered a final judgment awarding Green $15,083,148.91, consisting of $9,842,000 as the appraised value of Green's SARs; $3,067,000 as the Gross-Up Amount; and $2,174,148.91 in interest accrued to January 2, 2025. The order directed Fisk Alloy to submit the initial one-third payment on or before January 2, 2025, along with a promissory note

for the balance secured by a pledge of Eric Fisk's shares in the company. This appeal followed.

On appeal, Fisk Alloy makes the following arguments for our consideration:

> I. THE TRIAL COURT EXCEEDED ITS AUTHORITY BY DECIDING THE THRESHOLD ISSUE OF ARBITRABILITY.
>
> II. FISK ALLOY'S CHALLENGES ARE A NEW DISPUTE SUBJECT TO BINDING ARBITRATION.
>
>> A. Fisk Alloy's Challenges Constitute A "Controversy" Or "Dispute" "Arising Under" Or "Relating To" The Employment Agreement.
>>
>> B. The Trial Court's Contrary Conclusion Was Wrong.
>
> III. EVEN IF THE COURT DOES NOT SEND THIS MATTER TO ARBITRATION, VACATUR AND REMAND ARE STILL NECESSARY.
>
>> A. The Trial Court Gravely Overstepped Its Authority By "Confirming" Green's Request For An Interest Rate That Was Neither Arbitrated Nor Considered In The Appraisal.
>>
>> B. The Arbitrator's Calculation Of The Gross-Up Amount Exceeded His Contractual Authority.

C. The Trial Court's Refusal To Consider Any Of Fisk Alloy's Other Challenges Was Error.

D. At The Very Least, Vacatur And Remand Is Necessary To Correct The Trial Court's Undisputed Error In Awarding Green Interest On The Gross-Up Amount.

II.

"Judicial review of an arbitration award is very limited, and 'the arbitrator's decision is not to be cast aside lightly.'" Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel. Mizichko, 202 N.J. 268, 276 (2010) (quoting Bd. of Educ. of Alpha v. Alpha Educ. Ass'n, 190 N.J. 34, 42 (2006)). "Arbitration awards are favored by the courts and are generally presumed to be valid." Loc. No. 153, Off. & Pro. Emps. Int'l Union v. Tr. Co. of N.J., 105 N.J. 442, 448 (1987) (citing Cnty. Coll. of Morris Staff Ass'n. v. Cnty. Coll. of Morris, 100 N.J. 383, 390 (1985)). "Otherwise, the purpose of the arbitration contract, which is to provide an effective, expedient, and fair resolution of disputes, would be severely undermined." Fawzy v. Fawzy, 199 N.J. 456, 470 (2009) (citing Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 187 (1981)). Thus, "[i]n promoting a sense of finality, there is 'a strong preference for judicial confirmation of arbitration awards.'" Linden Bd. of Educ., 202 N.J. at 276

17

(quoting Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007)).

"The New Jersey Arbitration Act, N.J.S.A. 2A:23B-1 to -36 . . . , authorizes a party to file a summary action to confirm an arbitration award." Pami Realty, LLC v. Locations XIX Inc., 468 N.J. Super. 546, 556-57 (App. Div. 2021) (citing N.J.S.A. 2A:23B-22). "A court may vacate an award for very limited and specific enumerated reasons," none of which apply here. Id. at 557 (citing N.J.S.A. 2A:23B-23(a)).

We review the trial court's decision confirming an arbitration award de novo. Id. at 556 (citing Yarborough v. State Operated Sch. Dist. of Newark, 455 N.J. Super. 136 (App. Div. 2018)). "[W]hen binding arbitration is contracted for by litigants, the judiciary's role to determine the substantive matters subject to arbitration ends." Minkowitz v. Israeli, 433 N.J. Super. 111, 134 (App. Div. 2013). "Courts should intervene only where the arbitrator has exceeded his [or her] authority or acted improperly." Loc. No. 153, Off. & Pro. Emps. Int'l Union, 105 N.J. at 449. "Otherwise, the arbitrator has broad discretion and authority to draw on his [or her] own knowledge and experience in analyzing the facts and fashioning an appropriate remedy." Ibid.

Applying these principles, with the exception of the applicable interest rate, we affirm the judge's order confirming the arbitration award. Fisk Alloy argues that because its "challenges to the [a]ppraisal are arbitrable" and, under the Agreement, arbitrability disputes are to be decided by the arbitrator rather than the court, the judge "lacked jurisdiction to 'confirm' the [a]ppraisal or award Green her requested relief." Fisk Alloy asserts its challenges to the appraisal are arbitrable under the Agreement and the judge's "contrary conclusion . . . effectively placed the [a]ppraisal beyond review in any forum." As a result, according to Fisk Alloy, the "subsequent final judgment should be vacated and the case remanded with instructions to grant Fisk Alloy's motion to compel arbitration."

We rejected a similar argument in Cap City Products Co. v. Louriero, 332 N.J. Super. 499 (App. Div. 2000). There, the defendant Valentin Louriero, "the president and one of the two shareholders of Cap City Products Co., Inc. (Cap City)," and the other shareholder, the plaintiff Joseph Conte, "agreed that Conte would purchase all of Louriero's Cap City stock" when Louriero retired. Id. at 501. To determine the purchase price for the stock, they also agreed to "mutually select a third party to value the stock and to arbitrate a binding settlement" if they could not otherwise reach an agreement. Ibid. When they were unable to

A-1416-24

reach an agreement, they appointed Gary Trugman as a third party, who "provided an evaluation of the stock which included a twenty-five [percent] 'marketability discount.'" Ibid. When Louriero disagreed with Trugman's valuation, Conte filed suit "to enforce the parties' agreement and Trugman's valuation." Ibid.

Treating the matter as an application to enforce an arbitration award, the trial court concluded that "Trugman had committed 'an error as to law' by employing a marketability discount, and altered Trugman's award by deleting the discount and thus awarding Louriero a higher price for his stock." Ibid. We reversed and remanded "for entry of judgment in favor of Conte, based on Trugman's valuation of the stock." Id. at 502. We agreed with the trial court's characterization of the matter "as one seeking enforcement of an arbitration award." Id. at 503. However, we determined the trial court employed an incorrect standard in reviewing Trugman's award. Ibid. We held that unless otherwise provided in the parties' agreement, an arbitration award "may be vacated only for fraud, corruption, or similar wrongdoing on the part of the arbitrators." Id. at 504 (quoting Tretina Printing, Inc. v. Fitzpatrick & Assoc., Inc., 135 N.J. 349, 358 (1994)). "Thus, even assuming Trugman made a mistake

of law by using a marketability discount, that assumed mistake would provide no basis to overturn or modify his award[.]" Ibid.

We expounded:

> Indeed, even under the holding of Selected Risks Insurance Co. v. Allstate Insurance Co., 179 N.J. Super. 444 (App. Div. 1981), the case that set out the since-rejected pre-Tretina rule, the court made clear that an arbitrator's award must be affirmed if the legal proposition at issue was "debatable." Similarly, in Perini, the court referred to setting aside an arbitration decision only for a legal error that was "gross, unmistakable, undebatable, or in manifest disregard of the applicable law and leading to an unjust result." Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 496 (1992). Here, while one might debate the legal correctness of Trugman's use of a lack of marketability discount, there is no basis on which that decision could fairly be termed a gross error, an unmistakable error, or an undebatable error, nor could it be described as a decision made in "manifest disregard of the applicable law and leading to an unjust result." Ibid. It was, at the very least, a "reasonably debatable" proposition. Selected Risks Ins. Co., 179 N.J. Super. at 451. Indeed, the closeness of the question represents a graphic illustration of the wisdom of the Tretina conclusion, to avoid the litigation which must ensue if a question such as that presented here is to be resolved anew by the courts after it has been decided by an arbitrator.
>
> [Cap City Prods. Co., 332 N.J. Super. at 505 (citations reformatted).]

21

Likewise, here, the parties agreed to binding arbitration of any dispute "arising out of or in any way relating to" the Agreement. The parties also agreed to be bound by an appraisal to determine the fair market value of the company in order to value Green's SARs. The parties never indicated that such valuation was subject to arbitration if there was a disagreement. Id. at 508 (noting that it was "clear that the two agreed to be bound by the valuation"). Instead, the parties only agreed to delay payment "for a reasonable time to resolve such dispute." Had the parties intended to preserve the right to challenge the appraisal, such a provision could have been inserted in the Agreement.

Pursuant to the Agreement, following the arbitration, the arbitrator directed that the final award be provided to the chosen appraiser to determine the value of Green's SARs as of the Trigger Date. Further, the arbitrator directed Fisk Alloy to pay Green based on the appraisal in accordance with Section 5.2(c) and (e) of the Agreement. That is exactly what occurred and there was no basis for the trial court to do anything other than confirm and enforce that determination. We see no reason to reach a different conclusion because an appraiser, rather than an arbitrator, performed the appraisal and we reject Fisk Alloy's challenges to the appraisal as unpersuasive. To hold otherwise would

invite serial arbitrations to resolve inevitable disputes arising from unfavorable appraisals.[8]

We are satisfied the fundamental principles encouraging finality in the arbitration of disputes apply given the characterization of the arbitration and appraisal process in the Agreement. We discern no legal significance to the "asserted distinctions" between the appraisal and the final award. Ibid. "[A]rbitration is 'meant to be a substitute for and not a springboard for litigation,'" and "[a]rbitration should spell litigation's conclusion, rather than its beginning." N.J. Tpk. Auth. v. Loc. 196, I.F.P.T.E., 190 N.J. 283, 292 (2007) (quoting Loc. No. 153, Off. & Pro. Emps. Int'l Union, 105 N.J. at 449). "In brief, statutory and decisional law make clear that policy considerations favor finality and circumscribed judicial involvement in respect of arbitration proceedings." Ibid.

We reach a different conclusion with respect to the interest rate applicable to Green's SARs. In addition to paying Green the appreciation payment, the arbitrator directed Fisk Alloy to pay her "interest at the rate specified in Section 5.2(c)(ii) of the Agreement" with "interest accruing from what would have been

---

[8] Based on our decision, we need not address Green's argument that Fisk Alloy should be judicially estopped from arguing that disputes concerning the appraisal are subject to arbitration.

A-1416-24

the date of payment under Section 5.2(c) and (e) of the Agreement had this [a]rbitration proceeding not been brought until the date of the first payment." Section 5.2(c)(ii) provided for interest "at the applicable midterm federal rate as of the date of the [i]nitial [p]ayment." Pursuant to the Agreement, the initial payment was to be made no later than "[seventy-five] days after the applicable Trigger Date," which would have been March 15, 2021. The applicable midterm federal rate on that date was 0.62%.

Green did not dispute that the applicable midterm federal rate on that date was 0.62%. Instead, Green argued the mid-term federal rate of 4.13%, that was in effect as of September 15, 2023, should apply based on Fisk Alloy's bad faith. The judge adopted Green's position to correct a perceived "fundamental miscarriage of justice." However, in the absence of any principled basis for disregarding the arbitrator's decision and the terms of the Agreement as to the applicable interest rate, we are persuaded the judge erred in making that decision. See Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 183-84 (1985) (holding "in the absence of fraud, accident, or mistake, a court of equity cannot change or abrogate the terms of a contract" and "[e]quitable relief cannot be claimed because a contract is oppressive, improvident, or unprofitable, or because it produces hardship").

A-1416-24

"Absent a finding that one of the three statutory grounds" embodied in N.J.S.A. 2A:23B-24(a) is present, "a court may not modify a private sector arbitration award." Rappaport v. Pasternak, 260 N.J. 230, 234 (2025). N.J.S.A. 2A:23B-24(a) authorizes a court to modify or correct an arbitration award if

> (1) there was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award;
>
> (2) the arbitrator made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted; or
>
> (3) the award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

Because none of the statutory grounds are present, we reverse and remand for the judge to correct the final judgment by calculating the applicable interest rate at 0.62%.

The parties agree that the judge erred in awarding Green interest on the Gross-Up Amount. Green submitted a corrected order reducing the final judgment to account for the error but the corrected order was never executed. Therefore, during the remand proceedings, we also direct the judge to correct the final judgment by excluding interest on the Gross-Up Amount as agreed to by the parties.

25

To the extent any argument raised by Fisk Alloy has not been explicitly addressed in this opinion, it is because the argument lacks sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

26

A-1416-24